# United States Court of Appeals
## For the First Circuit

Nos. 10-1966
     10-1967

THOMAS MLODZINSKI; TINA MLODZINSKI, individually
and as mother and next friend of J.M.,

Plaintiffs, Appellees,

v.

MICHAEL F. LEWIS, in his individual and official capacities as
Bristol Police Department Sergeant; TIMOTHY J. WOODWARD, in his
individual and official capacities as Bristol Police Department
Officer; GORDON C. RAMSAY, in his individual and official
capacities as Bristol Police Department Officer; RICHARD ARELL,
in his individual and official capacities as Northfield Police
Department Officer; CENTRAL NEW HAMPSHIRE SPECIAL OPERATIONS
UNIT, a/k/a CNHSOU; ROBERT CORMIER, in his individual and
official capacities as Plymouth Police Department Officer; CHRIS
TYLER, in his individual and official capacities as Littleton
Police Department Officer; RICK TYLER, in his individual and
official capacities as Grafton Sheriff's Department Officer,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Howard, Circuit Judges.

Charles P. Bauer, with whom Gallagher, Callahan & Gartrell,
P.C. was on brief, for appellants Lewis, Woodward, and Ramsay.

William G. Scott, with whom Boynton, Waldron, Doleac, Woodman & Scott, P.A. was on brief, for appellants Central New Hampshire Special Operations Unit, Arell, Cormier, Chris Tyler, and Rick Tyler.

Matthew J. Lahey for appellees.

_____

June 2, 2011

_____

**LYNCH**, **Chief Judge**.  This § 1983 action alleges that on August 2, 2006, defendant law enforcement officers from the Bristol, New Hampshire police force and the Central New Hampshire Special Operations Unit (CNHSOU) used excessive force in executing search and arrest warrants.  Plaintiffs, who are family members of the suspect arrested, allege that their Fourth Amendment rights were violated by the officers' treatment of them while they were detained during the execution of the warrants.  Plaintiffs also bring state law claims of assault and battery.

Seeking to avoid a trial, both sets of law enforcement officers moved for summary judgment, arguing that they did not violate plaintiffs' rights, and that even if they had, they were entitled to qualified immunity on the grounds that their actions were not clearly unlawful.  Plaintiffs opposed, citing a number of material issues of disputed fact.  Indeed, on most of the key issues, the two sides offer vastly different versions of the facts. The district court denied the motions.  Mlodzinski v. Lewis, 731 F. Supp. 2d 157, 184 (D.N.H. 2010).  Defendants have appealed from the denial of qualified immunity.  We affirm in part and reverse in part.

## I.

An interlocutory appeal from a denial of summary judgment on qualified immunity grounds lies only if the material facts are taken as undisputed and the issue on appeal is one of law.

Rodríguez-Rodríguez v. Ortiz-Vélez, 391 F.3d 36, 39 (1st Cir. 2004).

In 1995, the Supreme Court in Johnson v. Jones, 515 U.S. 304 (1995), cut back on the broad scope of appeals from denials of summary judgment on qualified immunity that was thought to exist under Mitchell v. Forsyth, 472 U.S. 511 (1985). The Court stressed that the collateral order doctrine requires that a defendant's claim of immunity be conceptually distinct from the merits of a plaintiff's claim that his or her rights were violated, Johnson, 515 U.S. at 312, and it held that questions of "evidence sufficiency" are not sufficiently distinct to warrant interlocutory appeal, id. at 313-14. The Court explained that allowing an interlocutory appeal on a question of evidentiary sufficiency "makes unwise use of appellate courts' time, by forcing them to decide in the context of a less developed record, an issue very similar to one they may well decide anyway later, on a record that will permit a better decision." Id. at 317. Thus, it balanced interests in finality and avoidance of advisory opinions against the policy reasons for permitting interlocutory appeals so that government officials can avoid trial. Id. at 317-18.

This court has explored this aspect of Johnson on several occasions, initially in Stella v. Kelley, 63 F.3d 71 (1st Cir. 1995). There, we held that we had interlocutory jurisdiction over the legal question of whether a particular constitutional right

-4-

existed, but not over the fact-based question of whether the evidence showed that a defendant's actions violated that right.[1] Id. at 75. We explained that Johnson "permits immediate review of the rejection of a qualified immunity claim when the issue appealed concerns not what facts the litigants might (or might not) be able to prove, but, rather, whether a given set of facts shows a violation of a federally protected right." Id.

This court has assumed interlocutory appellate jurisdiction where defendants have accepted as true all facts and inferences proffered by plaintiffs, and defendants argue that even on plaintiffs' best case, they are entitled to immunity. Rodríguez-Rodríguez, 391 F.3d at 40; see also Valdizán v. Rivera-Hernandez, 445 F.3d 63, 65 (1st Cir. 2006) (accepting jurisdiction over issue of whether, on a given set of facts, an employee occupied a position for which political affiliation is an appropriate qualification). If even on plaintiffs' best case, there is no violation of their rights, or the law was not clearly established, or an objectively reasonable officer could have concluded (even mistakenly) that his or her conduct did not violate their rights, then qualified immunity must be granted. Accepting appellate review and granting immunity in this type of case

_____

[1] We have also held that where the immunity question turns on disputed factual issues of motivation or animus, interlocutory review is barred. Valdizán v. Rivera-Hernandez, 445 F.3d 63, 65 (1st Cir. 2006); Tang v. Rhode Island, 120 F.3d 325, 328 (1st Cir. 1997). No party argues this doctrine to us.

-5-

furthers public officials' strong interests in resolving immunity issues as quickly as possible.  <u>Maldonado</u> v. <u>Fontanes</u>, 568 F.3d 263, 268 (1st Cir. 2009).

Although we accept interlocutory jurisdiction in this case, we do so against a background in which even plaintiffs' best case against the CNHSOU officers is not entirely clear.  This not only raises some of the same concerns that led the Supreme Court in <u>Johnson</u> to limit interlocutory jurisdiction, but also leads us to question whether this use of appellate review is in the best interests of those seeking immunity.  Defendants, however, have opted not to create a summary judgment record of greater clarity, but rather to accept plaintiffs' version in order to test the immunity issue, so we accept jurisdiction.  <u>See</u> <u>Behrens</u> v. <u>Pelletier</u>, 516 U.S. 299, 313 (1996).

## II.

While a claim of qualified immunity requires deference to the objectively reasonable beliefs and actions of the defendants, even if they are mistaken, the summary judgment standard requires that we draw all reasonable inferences in plaintiffs' favor, as long as they are based on facts that "are put forward on personal knowledge or otherwise documented by materials of evidentiary quality."  <u>Morelli</u> v. <u>Webster</u>, 552 F.3d 12, 18-19 (1st Cir. 2009); <u>see</u> <u>also</u> <u>Scott</u> v. <u>Harris</u>, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). We identify the "version of events that best comports with the summary judgment standard and then ask[] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Morelli, 552 F.3d at 19. Here, the facts of the events leading up to the execution of the search and arrest warrants are undisputed and common to all defendants. Thereafter, the parties' versions diverge, as do the actions of the two groups of defendants and the claims of the individual plaintiffs.

In late July 2006, Bristol Police Department Sergeant Michael Lewis and Officer Gordon Ramsay had probable cause to believe that seventeen-year-old Michael Rothman had severely beaten a young male victim, Brandon Stachulski, with an expandable nightstick. They responded to the scene of the attack and interviewed one of Stachulski's assailants, and Stachulski identified Rothman as the other. Stachulski, who bore several clearly visible marks that were consistent with the use of a nightstick, told the officers where Rothman lived and "that he is known to carry a firearm."

On these grounds, Sergeant Lewis applied for warrants to arrest Rothman for second-degree assault and to search his residence for the nightstick. The Plymouth District Court issued

the warrants at around 9:30 p.m. on August 1, 2006, authorizing execution of the warrants "at any time of day or night."

That evening, Sergeant Lewis contacted defendant Robert Cormier, Commander of defendant CNHSOU, to request help executing the warrants. The CNHSOU is comprised of officers from the police departments of several towns in central New Hampshire and is trained for high-risk warrant executions. Lewis considered the execution high-risk due to the "viciousness of the assault and the allegations that Rothman was armed with an expandable baton and possibly a gun." Lewis also considered "the size of the structure occupied by Rothman and the likelihood that there would be other persons present." Cormier ordered fifteen members of the CNHSOU to meet at the Bristol police station.

After discussing the situation with Lewis, Cormier decided to use the assembled CNHSOU team to execute the warrants, entering the apartment before sunrise in order to catch Rothman by surprise and "thereby reduce the possibility of injury to police officers and third parties and to limit Rothman's opportunity to escape and dispose of the nightstick." It is standard operating procedure for CNHSOU members to carry automatic assault rifles, with the safety catches off, and to wear military-style camouflage uniforms and helmets.

During the preparations for the execution of the warrants, two surveillance teams kept the apartment, which was on

the second floor of a two-family house, under observation; they saw nothing of note. Sergeant Lewis knew that Rothman's stepfather, plaintiff Thomas Mlodzinski, and his mother, plaintiff Tina Mlodzinski, lived in the apartment, potentially with other family members, and that they would likely be home at the time of the execution of the warrants.

Just before 4 a.m., the CNHSOU officers used a battering ram to break down the front door of the apartment. The sound of the door breaking woke the sleeping plaintiffs. Upon being awakened, Michael Rothman walked out of his room into the hallway, where he encountered the officers and lowered himself to the floor as ordered. The officers arrested him, dressed him in shorts, and removed him from the unit. Rothman estimates that his exchange with the officers lasted about fifteen seconds, and defendants concede that he was arrested "immediately." He is not a plaintiff in this case.

After this point, the parties sharply dispute the facts, but we recite plaintiffs' version, as defendants have conceded--in order to obtain these interlocutory appeals--that all facts and inferences should be taken in plaintiffs' favor. We assume in plaintiffs' favor that Rothman was removed prior to all or most of the following events, although the evidence is unclear.

Plaintiff Jessica Mlodzinski, who is Rothman's sister and was fifteen years old at the time, was alone in her bedroom and

also got out of bed in response to the noise. When she opened her bedroom door, she encountered men in camouflage with assault rifles yelling, "Get down, palms in air!" and "search warrant!" Defendant Richard Arell of the CNHSOU was one of these men. He entered Jessica's room, and she got down on the floor. Jessica testified that while she was on the floor, she thought Arell said that she could get up and she started to do so, rising into a crouched position, but that Arell then put his hand on her back and forcefully pushed her toward the floor screaming "Get down."[2] She lost her balance, and her left kneecap was severely injured as it struck the floor.[3]

Back on the floor, Jessica was handcuffed behind her back with metal handcuffs, either by Arell or by defendant Rick Tyler, another CNHSOU officer who had entered the room upon hearing Officer Arell yelling "Get down" and hearing Jessica scream.[4] Jessica testified that she was detained on the floor with a gun

[2]    At another point in her deposition, Jessica described the actions as being less forcible. But Thomas Mlodzinski also said he saw her being shoved to the floor after trying to get up, and we take that evidence in plaintiffs' favor.

[3]    Since the incident, Jessica's left knee has given out, and she has had two surgeries and been in physical therapy. She also has nightmares and has been diagnosed with Post Traumatic Stress Disorder.

[4]    Although Jessica testified in her deposition that "the first guy" to enter her room, Officer Arell, had placed the handcuffs on her, Arell stated that he did not recall doing so, and Officer Tyler took credit for doing it.

pointed at her head by Arell, and that during this period, she was "just staying still and trying not to get shot."[5]  She estimates that she was detained in this manner for seven to ten minutes, after which she was brought downstairs to the living room.

In the meantime, a CNHSOU officer wearing military fatigues and carrying an assault rifle had also entered the bedroom of plaintiffs Tina and Thomas Mlodzinski.  This officer was defendant Chris Tyler.  He ordered Thomas, who had gotten out of bed when he heard the door breaking, to get on the floor.  Thomas and Tina testified that another CNHSOU officer in military fatigues, who has not been identified by plaintiffs, handcuffed Thomas behind his back with zip ties, kneeing him in the back in the process.[6]  This officer held a gun to Thomas's head for what he described as a "short time," after which he was taken into the living room.

Tina testified that during this period, she was still in bed--wearing only underpants and without a sheet covering her, as it had been very hot that night--with a gun pointed at her head by

_____

[5]     The officers deny their weapons were held to the heads of plaintiffs and say they were always kept at a forty-five degree angle to the floor, but we must take plaintiffs' version as true.

[6]     Defendant Chris Tyler denies that anyone kneed Thomas in the back, and as plaintiffs have not identified this officer, they do not assert any claim arising out of this alleged mistreatment.

-11-

a CNHSOU officer standing two feet away.[7]  That officer said to her, "Down on the ground, palms in the air."  But when Tina explained that she did not have a top on, she was allowed to stay on the bed, covering herself with a pillow.  She was also handcuffed behind her back with zip ties.  She testified that the officer "had a gun at my head all the time."  In response to a question about how long she was detained in this manner, she stated that "it seemed like it was forever but [was] almost half [an] hour."  Eventually, a female officer associated with CNHSOU came into the room, wrapped a sheet around Tina, and brought her downstairs to the living room.[8]

When Tina arrived downstairs, Jessica and Thomas were already there, as was Rothman's girlfriend, Amy Furmanick, and

---

[7]    The district court read the record as showing either that this officer was Chris Tyler or that Chris Tyler was present and allowed another officer to point a gun at Tina's head.

[8]    While defendants have asked us to accept Tina's testimony that she was held for half an hour with a gun to her head, we note that this account is inconsistent with the time frames used by her husband and daughter and inconsistent with the testimony of Kate Ranson, the female officer who accompanied her downstairs.  Ranson testified that after the door of the apartment was breached, she went inside "within a minute or two" and went up the stairs.  She immediately saw an officer standing with Tina, who had a sheet wrapped around her, and the officer directed her to hold the sheet and take Tina to the living room, which she did.

-12-

their baby.[9]  Jessica estimated that her mother arrived three to five minutes after she, Jessica, was brought down.

In the living room, officers from both the CNHSOU and Bristol police were involved in plaintiffs' detention.  There were at least two members of the Bristol police, Sergeant Lewis and Officer Woodward, and one armed CNHSOU officer, whose gun was pointing towards the floor.  Jessica testified that Lewis was "ranting and raving" about the nightstick, that he told plaintiffs that they were "under arrest until we get the stick," that he read them their Miranda rights, and that he said, referring to Rothman and Furmanick's baby, "We're going to take the baby away unless we get some answers."[10]

Plaintiffs testified that they remained in handcuffs for forty-five minutes to an hour while the house was searched and they were questioned in the living room.[11]  During this time, Officer Ramsay took Jessica and Amy into the kitchen at separate points to ask them questions.  Jessica estimated that her interview occurred

---

[9]    Amy was not handcuffed and is not a plaintiff.  She states that it was five to ten minutes from the time the police entered the room she shared with Rothman until she was taken with their baby down to the living room.

[10]    Sergeant Lewis denies making this threat and states that he only questioned plaintiffs about the location of the nightstick.

[11]    Sergeant Lewis says that he ordered the handcuffs removed when plaintiffs were brought to the living room and that plaintiffs were not cuffed when he began talking to them.  Other testimony calls into question plaintiffs' estimate that they remained in handcuffs for forty-five minutes to an hour.

approximately ten minutes after they were all assembled in the living room.[12]  Both Tina and Jessica estimated that at least some of the CNHSOU officers left thirty-five to forty minutes after they were all assembled in the living room.

After approximately forty-five minutes, an unidentified Bristol police officer removed Thomas's zip-tie handcuffs with a pair of cutters, and Tina was allowed to remove hers.  Thomas then remained in the living room watching television, and Tina returned to her bedroom and dressed.  Tina then accompanied an officer in army fatigue pants while he searched the apartment for five minutes and the basement for ten minutes.

In the meantime, Jessica's handcuffs were also removed, and she and Officer Ramsay accompanied Amy in going outside for a cigarette.  During this cigarette break, Ramsay allegedly told Jessica and Amy that if the police could not find the nightstick, they were going to take away Amy's baby.  At some point, Tina came onto the porch as part of her walk around the house with the officer.  She spent five to ten minutes talking with Jessica, who told her about Rothman's fight.

At around 5 a.m., Tina provided a Bristol police officer with a "voluntary statement," stating the limited information she

_____

[12]    While Jessica testified that her handcuffs were still on during this time, Officer Ramsay testified that he is "close to one hundred percent sure" that Jessica was not handcuffed when he brought her into the kitchen.

-14-

knew about Rothman's fight with Stachulski. Tina testified that after she provided the statement, all of the remaining officers left.[13] This included Lewis, Woodward, and another Bristol officer, as well as two CNHSOU officers. Tina and Jessica testified that the "head guy" in the CNHSOU also did not leave until this point.[14]

In the end, the search uncovered three baggies with small quantities of marijuana, a glass smoking pipe, and an eight-inch hunting knife hidden under Rothman's bed. No gun or nightstick was ever found. Rothman later acknowledged that he had hidden the nightstick under the stairs outside the apartment prior to the search, and that afterwards he disposed of it by throwing it into a river.

### III.

We review a district court's denial of summary judgment on qualified immunity grounds de novo. Guillemard-Ginorio v. Contreras-Gómez, 490 F.3d 31, 38 (1st Cir. 2007).

Under the doctrine of qualified immunity, police officers are protected "from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[13] At another point in Tina's testimony, when asked what time the final officers left, she estimated that it was around 6:30 a.m. This is inconsistent with her testimony that they left after her 5 a.m. statement. In any event, there is no allegation that anything about the search was unreasonable during this time.

[14] Commander Cormier, the head of CNHSOU, testified that he left "within a minute or two" of the main group of CNHSOU officers, who he recalls leaving ten minutes after their initial entry.

-15-

constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). They receive "immunity from suit and not a mere defense to liability." Maldonado, 568 F.3d at 268.

Following Pearson, we employ a two-prong analysis in determining whether a defendant is entitled to qualified immunity. We ask "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Id. at 269. The second prong, in turn, has two parts. We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right. Decotiis v. Whittemore, 635 F.3d 22, 36 (1st Cir. 2011). The salient question is whether the state of the law at the time would have given a reasonably competent officer "clear notice that what he was doing was unconstitutional." Id. at 37 (quoting Costa-Urena v. Segarra, 590 F.3d 18, 29 (1st Cir. 2009)) (internal quotation mark omitted).

Unlawfulness must be apparent at the time of the alleged violation "in the light of pre-existing law." Anderson v.

Creighton, 483 U.S. 635, 640 (1987). "Immunity exists even where the abstract 'right' invoked by the plaintiff is well-established, so long as the official could reasonably have believed 'on the facts' that no violation existed." Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69 (1st Cir. 2002). Although the Supreme Court has made clear that officers can "be on notice that their conduct violates established law even in novel factual circumstances," Hope v. Pelzer, 536 U.S. 730, 741 (2002), it has also stressed that qualified immunity "is designed to protect 'all but the plainly incompetent or those who knowingly violate the law,'" Morse v. Frederick, 551 U.S. 393, 429 (2007) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Immunity will not issue if "it is obvious that no reasonably competent officer would have concluded" that an action was lawful, but if "officers of reasonable competence could disagree" on the lawfulness of the action, defendants are entitled to immunity. Malley, 475 U.S. at 341. This test imposes an objective standard of reasonableness.

IV.

We divide our analysis into two parts. We first consider the Fourth Amendment claims brought by all three plaintiffs against the Bristol police officers and Commander Cormier on the basis of their prolonged detention in handcuffs after they were brought into the living room. We then consider the Fourth Amendment and assault

-17-

and battery claims brought by Tina and Jessica against the CNHSOU officers who detained them in their bedrooms prior to bringing them down into the living room.

Although excessive force is by definition unreasonable force, "reasonable people sometimes make mistaken judgments, and a reasonable officer sometimes may use unreasonable force." Morelli, 552 F.3d at 24. When this occurs, "qualified immunity gives an officer the benefit of a margin of error." Id.; see also Saucier v. Katz, 533 U.S. 194, 205-06 (2001) ("Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force' . . . ." (quoting Priester v. Riviera Beach, 208 F.3d 919, 926-27 (11th Cir. 2000))); Jennings v. Jones, 499 F.3d 2, 18 (1st Cir. 2007) ("[O]fficers receive protection if they acted reasonably in exercising unreasonable force."). For plaintiffs to defeat a qualified immunity defense, they must show "an incommensurate use of force beyond that needed to establish a garden-variety excessive force claim and, further, beyond the 'hazy border' noted by the Saucier Court." Morelli, 552 F.3d at 24 (quoting Saucier, 533 U.S. at 206).

Here, plaintiffs and defendants accept four basic propositions of law as clearly established at the time of the execution of the warrants. They agree that it was clearly established that "officers executing a search warrant for contraband have the authority 'to detain the occupants of the

-18-

premises while a proper search is conducted.'" <u>Muehler</u> v. <u>Mena</u>, 544 U.S. 93, 98 (2005) (quoting <u>Michigan</u> v. <u>Summers</u>, 452 U.S. 692, 705 (1981)).  They acknowledge that the "authorization to detain an occupant of the place to be searched is the authority to use <u>reasonable</u> force to effectuate the detention."  <u>Id.</u> at 98-99 (emphasis added).  They accept that the use of handcuffs is sometimes warranted to detain such occupants. <u>Id.</u> at 99.  And they agree that the duration of the use of handcuffs must be objectively reasonable given the context.  <u>Id.</u> at 100; <u>see</u> <u>also</u> <u>Graham</u> v. <u>Connor</u>, 490 U.S. 386, 388 (1989).

A.          <u>The Bristol Police Officers and CNHSOU Commander Robert</u>
            <u>Cormier</u>

All three plaintiffs bring claims of unreasonable seizure against the Bristol officers and Commander Cormier on the theory that there was no justification for keeping them in handcuffs in the living room for forty-five minutes to an hour while the police searched the apartment.  The qualified immunity question before us is whether a reasonably competent officer could have thought, even mistakenly, that in light of the clearly established law at the time, it was reasonable to keep plaintiffs in handcuffs for this duration while the search was executed.

Whether a seizure is reasonable depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat

-19-

to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

Defendants argue that given the injuries inflicted by Rothman during the beating that precipitated the execution of the warrants and the report to Sergeant Lewis that Rothman was known to carry a firearm, a reasonable officer could have believed that plaintiffs' continued detention would not outweigh the officers' safety interests. Cf. Summers, 452 U.S. at 702-03 (stating that minimizing the risk of harm to officers is a substantial justification for detaining an occupant during a search). But this argument glosses over the fact that Rothman had been removed from the scene before his family was taken to the living room. Once he was removed, any threat from him or that the three plaintiffs would try to assist him in avoiding arrest was eliminated. The question then is whether there were other valid reasons to keep plaintiffs in handcuffs after Rothman's arrest and removal.

After Rothman was removed and most of the CNHSOU officers left, it appears that six officers remained in the house. These officers had the combined task of searching a three bedroom apartment, including adjoining areas and a basement, and ensuring that the occupants did not interfere with that search. This itself

was a good reason to keep the occupants together in one room.  The reasonableness of keeping them in handcuffs, however, is a different matter.

Defendants rely heavily on Mena, which at the time was the most recently established Supreme Court case on detention in handcuffs during execution of a search warrant.  In Mena, a qualified immunity case, the Supreme Court held that there was no Fourth Amendment violation when Iris Mena was detained in handcuffs for the two- to three-hour duration of a warrant-authorized search of her building for deadly weapons and evidence of gang membership following a drive-by shooting.  Mena, 544 U.S. at 95-96.  It was known that the suspect in the shooting, and possibly other gang members, rented rooms in the building.  Id.

The warrant in that case was executed by a SWAT team at 7 a.m.  Id. at 96.  Mena was found asleep in bed, and placed, at gunpoint, in handcuffs.  Id.  Three other individuals living on the premises were also put in handcuffs, and all four were moved to a garage.  Id.  Although they were allowed to move about in the garage, the four detainees remained cuffed.  Id.  They were guarded by one or two officers, while the other officers performed the search.  Id.

The Court concluded that the "use of force in the form of handcuffs to effectuate Mena's detention in the garage . . . was reasonable because the governmental interests outweigh the marginal

intrusion." Id. at 99.[15]  The Court reasoned that it was "no ordinary search" because it involved "a search for weapons" and because "a wanted gang member reside[d] on the premises," making it an "inherently dangerous" situation.  Id. at 100.  Under the circumstances, it held, the governmental interests in detaining and using handcuffs were "at their maximum."  Id.

The Court recognized that handcuffing was a more intrusive form of detention than that which it had previously upheld and that Mena's claim was not about mere detention and handcuffing, but rather about the two- to three-hour duration.  But it rejected her argument that this violated the Fourth Amendment. Emphasizing that the case "involved the detention of four detainees by two officers during a search of a gang house for dangerous weapons," it held that the duration of the "detention in handcuffs in this case does not outweigh the government's continuing safety interests."  Id.[16]

Appropriately, defendants here do not contend that Mena's approval of the use of handcuffs for the two- to three-hour period

_____

[15]    Because the Court held that there was no constitutional violation, it did not reach the other prongs of the qualified immunity analysis.

[16]    Mena also claimed that her detention continued after the police completed the tasks incident to the search, and that this violated the Fourth Amendment.  The Supreme Court explained that it would not address this contention because the court of appeals had not done so.  Muehler v. Mena, 544 U.S. 93, 102 (2005).  Plaintiffs here make no such claim.

of the search sets a per se rule that this is a permissible duration. Rather, they argue that Mena was sufficiently like this situation so that a reasonable officer could have thought his actions constitutional under Mena, or at least debatably so. Several features of the case support the objective reasonableness of that conclusion.

Defendants could have reasonably thought that officer safety concerns justified the use of the handcuffs to avoid any danger, however small, that the detained occupants would use the hidden nightstick or possibly a gun to harm them. See id. ("[T]his safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs . . . ."); see also Summers, 452 U.S. at 702-03 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.").

Defendants also had a valid interest in conducting an unimpeded search thoroughly and efficiently, and the use of handcuffs assisted in this. The handcuffs prevented the occupants of the house from interfering with the search, and from attempting to dispose of the nightstick. See Mena, 544 U.S. at 98; see also Summers, 452 U.S. at 702-03 (recognizing that the government's interest in "the orderly completion of the search" and preventing "frantic efforts to conceal or destroy evidence" may justify

detention).  There is no allegation that plaintiffs were handcuffed longer than it took to search the house.

A reasonable officer could have also taken into account the fact that the plaintiffs did not--on this record--complain that the handcuffs were painful.  As Justice Kennedy explained in his Mena concurrence, which he wrote to provide more guidance to police and "help ensure that police handcuffing during searches becomes neither routine nor unduly prolonged," Mena, 544 U.S. at 102 (Kennedy, J., concurring), there are special concerns raised when handcuffs hurt the person cuffed:

> If the search extends to the point when the handcuffs can cause real pain or serious discomfort, provision must be made to alter the conditions of detention at least long enough to attend to the needs of the detainee. . . . The restraint should also be removed if, at any point during the search, it would be readily apparent to any objectively reasonable officer that removing the handcuffs would not compromise the officers' safety or risk interference or substantial delay in the execution of the search.

Id. at 103.  Here, there is no evidence that any of the plaintiffs made any complaints about the handcuffs.  Indeed, the cuffs on Tina apparently loosened so much that when the police said they would cut them off, she said they did not need to.  She apparently slipped them off.  The absence of complaints was a factor a reasonable officer could have taken into consideration.

In light of Mena, we conclude that the question of qualified immunity must be decided in favor of these officers.

-24-

They are entitled to immunity because it would have been fairly debatable among reasonable officers whether detaining plaintiffs in handcuffs for forty-five minutes to an hour during the search was reasonable under the facts.

We say the question was fairly debatable because, as the district court carefully noted, there are some obvious differences from Mena which we believe reasonable officers should have considered. First, the number of detainees did not, as in Mena, outnumber the number of officers throughout the period of their detention. Cf. id. (noting that the detainees outnumbered those supervising them, "and this situation could not be remedied without diverting officers" from the search). Second, plaintiffs' home was not a gang house known to have firearms in it, but rather an apartment known to house a family that included a fifteen-year-old girl; other than Rothman, the remaining members of the family were not known or even suspected to be violent. Cf. id. at 100 (majority opinion). Third, the object of the search was a nightstick used when two teenagers attacked another one over a girl, rather than a gun possessed by a gang member who had recently been involved in a drive-by shooting; although the officers had a fear that there was a firearm on the premises that could be used against them, that fear did not have the same foundation as in Mena. Cf. id. at 95-96. Based on these differences, a reasonable

officer might well have reached a different conclusion than defendants did here.

However, these factors are not so substantial that no competent officer could have thought that the use of handcuffs during the search was permissible. "Even if this reasoning were mistaken, it would not have been egregiously so and, accordingly, qualified immunity is available." Wagner v. City of Holyoke, 404 F.3d 504, 509 (1st Cir. 2005); see also Malley, 475 U.S. at 341 (stating that qualified immunity is available when "officers of reasonable competence could disagree").

We reverse the denial of immunity on all claims arising out of this handcuffing and order entry of judgment granting qualified immunity. To be clear, we are not holding that on plaintiffs' version of the facts there was no constitutional violation, but rather that if there was a violation, it was not so clear as to give the officers fair warning.

B.       CNHSOU Officers Richard Arell, Robert Cormier, Chris Tyler, and Rick Tyler

Plaintiffs Jessica and Tina claim that they were subjected to excessive force in violation of the Fourth Amendment, as well as assault and battery, by the CNHSOU officers who detained them in their bedrooms before bringing them down to the living room. The question here is whether the force used in detaining Jessica and Tina is consistent with the kind of judgment that a

-26-

reasonable police officer under the same or similar circumstances might have made.

For Jessica, the claim of excessive force is based on the fact that she was shoved to the floor by Officer Arell, severely damaging her kneecap, and that she was then handcuffed behind her back with metal handcuffs and detained with an assault rifle held to her head for seven to ten minutes, far beyond the time it took to locate, arrest, and remove Rothman. We do not separate these facts out but rather take them as a whole.[17] On plaintiffs' version of events, Jessica, a fifteen-year-old girl, was in no way a threat to the officers. She was not a suspect and made no efforts to resist, but rather complied with all commands. And the officers' actions are alleged to have caused her serious physical injury, which required two surgeries and extensive treatment, as well as psychological injury, including Post Traumatic Stress Disorder.

First, the facts are sufficient to support a finding that a Fourth Amendment violation occurred. Second, taking all facts and inferences in Jessica's favor, we conclude, as did the district court, that the CNHSOU officers involved are not on this state of

---

[17] Defendants attempt to carve out the portion of these events pertaining to Jessica being "forced" back down to the floor based on her testimony, at deposition, that the hand placed on her back did not "shove me to the floor." But she repeatedly said that the officer put his hand on her back and "pushed" or "shoved" her forward, causing her to hit the floor, and that he "should have never laid a hand on" her. Defendants cannot have it both ways; in order to have interlocutory appellate review, they have accepted all facts in plaintiffs' favor.

the record entitled to immunity. The law was sufficiently well established to provide the officers with fair warning that the force they are alleged to have used on Jessica was excessive given the circumstances. While the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving," Graham, 490 U.S. at 396-97, the need to subdue Jessica and to keep a weapon trained at her head while she was in metal handcuffs was minimal at best, and certainly did not last for seven to ten minutes.

Although not "every push or shove" will reach the level required for an actionable excessive force claim, Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 352 (1st Cir. 1995), no reasonably competent officer would have thought the totality of force used against Jessica was permissible given the facts of her situation, taking all inferences in plaintiffs' favor. Cf. Morelli, 552 F.3d at 24 (finding that no reasonable officer could have thought it reasonable to yank the arm of an unarmed and non-violent person, suspected only of the theft of $20, and pin her against a wall for three to four minutes with sufficient force to tear her rotator cuff).

A reasonably competent officer also would not have thought that it was permissible to point an assault rifle at the head of an innocent, non-threatening, and handcuffed fifteen-year-

old girl for seven to ten minutes, far beyond the time it took to secure the premises and arrest and remove the only suspect. See, e.g., Holland ex rel. Overdoff v. Harrington, 268 F.3d 1179, 1192-93 (10th Cir. 2001) (denying qualified immunity to officers who detained children, including teenagers, at gunpoint after gaining complete control of the situation); McDonald ex rel. McDonald v. Haskins, 966 F.2d 292, 295 (7th Cir. 1992) (denying qualified immunity to officer who during search of residence held gun to head of nine-year-old and threatened to pull trigger); see also Baker v. Monroe Twp., 50 F.3d 1186, 1192-94 (3rd Cir. 1995) (reversing summary judgment on grounds that constitutional violation could be found if officers had, as alleged, pointed guns at fifteen- and seventeen-year-olds and handcuffed some of them for up to twenty-five minutes when they were merely visiting house that was being searched). Even without a First Circuit case presenting the same set of facts, defendants would have had fair warning that given the circumstances, the force they are alleged to have used was constitutionally excessive. Cf. Tekle v. United States, 511 F.3d 839, 848 (9th Cir. 2007) ("Although there may not be a prior case specifically prohibiting the use of handcuffs and weapons by more than twenty officers to subdue an unarmed eleven-year-old boy who is not suspected of any wrongdoing and is cooperating with the officers, '[a]ny reasonable officer should have known that such conduct constituted the use of excessive force.'" (alteration in

original) (quoting Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1061 (9th Cir. 2003))).

Defendants have not even come forward with a justification for pointing a gun at Jessica's head.[18] Their defense is that they did not use the force they are alleged to have used. Assuming Jessica's version of the relevant facts to be true, we cannot say that a reasonable officer would have used such force. On Jessica's account, defendants' actions are "outside the universe of protected mistakes." Morelli, 552 F.3d at 24.

As for Tina, her case turns on her claim that an assault rifle was pointed to her head for up to half an hour. In that period of time, her son was removed from the house, her husband was taken downstairs, and she was handcuffed and lying partially nude in bed. While the CNHSOU officers did initially have to make split second decisions to assess Tina's threat level and the possible need for restraint, that does not characterize the entire period in the bedroom, which she says was half an hour. Rather, it quickly became clear, on plaintiffs' version of the facts, that Tina was not the suspect, that she was not trying to resist arrest or flee, that she was not dangerous, and that she was not trying to dispose

---

[18] Further, as to the handcuffing, one of the CNHSOU officers who participated in executing the warrants and is now an assistant commander testified that in executing a warrant, there would be no need--and it would be against his training--to handcuff either a fifteen-year-old girl or an adult woman with a sheet wrapped around her, unless she was a suspect or posed a threat.

-30-

of contraband or weapons.  Further, she was completely compliant with all orders.  These are all relevant factors under <u>Graham</u> that undercut any claim that defendants acted reasonably.

The circumstances of Tina's detention in bed are unlike those in which a reasonable officer could have thought that keeping a gun pointed at her head was lawful.  Cf. <u>Los Angeles Cnty.</u> v. <u>Rettele</u>, 550 U.S. 609, 610 (2007) (finding qualified immunity on the grounds that there was no constitutional violation when police entered bedroom with guns drawn, ordered plaintiffs out of bed, forced them to stand naked at gunpoint for one to two minutes, and detained them for a few more minutes, before realizing that they had made a mistake and leaving the house).  There was no reasonable danger that Tina, who was not a suspect and was nearly naked in bed and without a sheet, was concealing a weapon.  Cf. <u>id.</u> at 614.  The officers were not carrying out a warrant for a group of individuals who might have been engaged in joint criminal activity with Rothman.  Cf. <u>id.</u> at 610.  And the gun pointed at Tina was not, on her version, lowered as soon as it was clearly safe to do so.  Cf. <u>id.</u> at 615.

Defendants had fair notice that under the circumstances alleged, the detention of Tina with an assault rifle at her head was objectively unreasonable.  See, e.g., <u>Baird</u> v. <u>Renbarger</u>, 576 F.3d 340, 347 (7th Cir. 2009) (denying qualified immunity to officer who pointed gun at plaintiff when "there was no hint of

danger"); Jacobs v. City of Chicago, 215 F.3d 758, 773-74 (7th Cir. 2000) (denying qualified immunity to officer who pointed a gun at an elderly man's head for ten minutes after realizing that he was not the desired suspect and presented no resistance or threat); see also Harrington, 268 F.3d at 1193 ("Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use."). As with Jessica, defendants offer no justification for holding an assault rifle to Tina's head.

The CNHSOU officers also argue that the doctrine of official immunity protects them from Jessica's and Tina's related state law assault and battery claims. We reject this argument for the same reasons identified by the district court. See Mlodzinski, 731 F. Supp. 2d at 183. Under the doctrine of official immunity, "municipal police officers are immune from personal liability for decisions, acts or omissions that are: (1) made within the scope of their official duties while in the course of their employment; (2) discretionary, rather than ministerial; and (3) not made in a wanton or reckless manner." Everitt v. Gen. Elec. Co., 932 A.2d 831, 845 (N.H. 2007). Given defendants' failure to establish that a reasonable officer in their position would have believed his

conduct was consistent with Jessica's and Tina's Fourth Amendment rights, they have also failed to establish that they did not act in a wanton or reckless manner. Cf. Binay v. Bettendorf, 601 F.3d 640, 652-54 (6th Cir. 2010) (denying official immunity from assault and battery claim arising out of excessive force during arrests for essentially the same reasons that it denied qualified immunity from overlapping Fourth Amendment claim).

A more fleshed-out record on summary judgment than the bare-bones details with which we have been presented could well have affected the outcome of each of the immunity issues. For example, the situation would be very different if, given the execution of these warrants, Tina had been detained with a weapon pointed at her for only a very short period needed while she was being cuffed, her husband was being escorted out of the room, and her son was being apprehended. Our denial of immunity on plaintiffs' version of the events leaves these claims for trial, where defendants may try to persuade the jury that they did not do what they are accused of doing.

V.

We affirm in part and reverse in part and remand for further proceedings consistent with this opinion.

One-half of the costs are awarded to the plaintiffs, to be taxed against the CNHSOU defendants.