# United States Court of Appeals
## For the First Circuit

No. 16-2107

ALFONSO CIOLINO,

Plaintiff, Appellee,

CINSIA CIOLINO,

Plaintiff,

v.

GEORGE GIKAS,

Defendant, Appellant,

DAVID EARLE; AARON EASTMAN; BRIAN CROWLEY; FRANK G.
COUSINS, JR., Sheriff, Essex County; CITY OF GLOUCESTER,
Commonwealth of Massachusetts; JOHN DOE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Stephen C. Pfaff, with whom Louison, Costello, Condon & Pfaff
LLP was on brief, for appellant.
Robert S. Sinsheimer, with whom Wesley B. Stoker and
Sinsheimer & Associates were on brief, for appellee.

June 28, 2017

**LYNCH**, **Circuit Judge**.  This excessive force case, brought under 42 U.S.C. § 1983, stems from an arrest on June 30, 2013.  Defendant George Gikas, a police officer on crowd-control duty, grabbed plaintiff Alfonso Ciolino from behind by the collar and dragged him backward and downward to the pavement, after seeing Ciolino taunting K-9 dogs.  The forceful takedown caused Ciolino to sustain a torn rotator cuff.  The incident was captured on a 24-second video, admitted into evidence at trial.  We are faced with the question of whether to sustain the district court's post-verdict denial of qualified immunity to Sergeant Gikas.  See Ciolino v. Eastman, No. 13-cv-13300-ADB, 2016 WL 4148197 (D. Mass. Aug. 4, 2016).  We affirm.

The jury found that Gikas violated Ciolino's Fourth Amendment right to be free from excessive force.  Responding to special questions on the verdict form, the jury also found that Ciolino failed to comply with police orders and taunted K-9 dogs immediately prior to his arrest and that Gikas had probable cause to arrest Ciolino on the night in question.  The jury did not answer one of the special questions, which asked whether Ciolino was "inciting the surrounding crowd immediately prior to his arrest."

The district court then denied Gikas's post-verdict motion for judgment as a matter of law, rejecting Gikas's argument that he was entitled to qualified immunity.  We agree with the

- 3 -

district court that a reasonable officer in Gikas's position would have understood that Gikas's actions violated Ciolino's Fourth Amendment right to be free from excessive force.

We also find no abuse of discretion in the district court's decisions not to define the word "incited" for the jury, in the context of the special question on the verdict form, and to allow the jury to leave that question unanswered.

## I. Background

A. Facts

We adopt the district court's recitation of the facts but provide the following summary. Like the district court, we view the facts in the light most favorable to the verdict, deferring "to the jury's discernible resolution of disputed factual issues." Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010) (quoting Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999)).

On Saturday, June 29, 2013, Alfonso Ciolino, his wife Cinsia, and two other couples attended together the annual St. Peter's street festival in downtown Gloucester, Massachusetts. The group eventually arrived at the St. Peter's Club on Main Street ("the Club"), and Ciolino briefly went inside with one companion to use the men's bathroom while the rest of the group waited outside. Ciolino testified that he had "maybe a beer and a half,

maybe two" over the course of the evening and that he was not drunk when he left the Club around midnight.

A crowd had gathered outside the Club shortly after midnight, which was approximately when Ciolino left the Club. Law enforcement officers from different departments and K-9 dogs were present for crowd-control purposes. Gikas, a Sergeant from the Essex County Sheriff's Department, and his colleague, Sergeant John Pickles, were present on K-9 duty. Two other officers from the same department, Aaron Eastman and David Earle, were also present on plainclothes duty. Around the time Ciolino was leaving the Club, officers ordered the crowd to disperse. Some members of the crowd began moving along the sidewalk; others moved slowly or not at all. Sergeant Gikas and Sergeant Pickles were standing in the street, facing the crowd, which was gathered on the sidewalk. Gikas and his dog were about six feet away from the sidewalk; Pickles and his dog were in front of Gikas, closer to Ciolino and the sidewalk. Ciolino walked away from the Club's exit, in the direction of Sergeant Gikas and Sergeant Pickles.

On the video, Ciolino is seen walking along the sidewalk, pausing in front of Pickles's dog in the street, and gesturing toward the dog, without ever touching the dog or leaving the sidewalk. Ciolino admits that he also said something along the lines of "Look, the dogs got . . . muzzle[s] in their mouths. They

can't do anything."  It is clear on the video, and is undisputed,[1] that Ciolino then turns his back to the street, away from Gikas, Pickles, and the dogs.  The video shows Gikas's and Pickles's dogs barking continuously toward the crowd both before and after Ciolino's gesture.

The video shows no visible reaction by Pickles after Ciolino's gesture toward Pickles's dog.  Nor does anyone in the crowd appear to react, although the video captures only a portion of the crowd.  The district court stated, and the video confirms, that Ciolino "did not use or threaten violence, nor was he inciting the crowd to act violently" in a manner that warranted a sudden and forceful arrest.  Ciolino, 2016 WL 4148197, at *5.

The video shows Gikas then walking up to Ciolino, grabbing Ciolino from behind by at least his shirt collar, and yanking Ciolino forcibly backward and downward, off the sidewalk and onto the pavement in the street.[2]  Ciolino is seen falling

---

[1]  Witnesses at trial, including Gikas, confirmed that Ciolino had turned away from the dogs and the officers in the street, and was facing the crowd on the sidewalk, before Gikas approached him and seized him.

[2]  At oral argument, Gikas's counsel disputed the notion that Gikas "threw" Ciolino to the ground.  That word was used at trial both by Ciolino and by two witnesses to Ciolino's arrest. The video makes it clear that Gikas seized Ciolino and used force in bringing him to the ground.  The jury's verdict establishes that the force, however characterized, was excessive.  Gikas does not challenge the sufficiency of the evidence supporting the verdict.

awkwardly to the ground, landing hard on his right side. The video ends with Eastman and Earle, the plainclothes officers, converging on the prone Ciolino and handcuffing him. Ciolino was later diagnosed with a torn rotator cuff as a result of the incident.

Ciolino was taken to the police station after his arrest and charged with a Gloucester ordinance violation and disorderly conduct. The Gloucester District Court later dismissed the charges.

B.    District Court Proceedings

Ciolino and his wife brought suit in federal court on December 31, 2013, pleading § 1983 and state law claims against Gikas, several other officials, and the City of Gloucester.[3] On September 3, 2015, the district court granted in part the defendants' motion for summary judgment but allowed the § 1983 excessive force claim and a state law malicious prosecution claim to proceed to trial against Gikas, Eastman, and Earle.

The trial began on January 19, 2016. The verdict form included four questions framed and posed by the district court, over Ciolino's objection. The jury answered "yes" to Questions 3(a), 3(b), and 3(c):

---

[3]    Officers Eastman, Earle, and Brian Crowley were also named as defendants, as was Frank Cousins, Jr., the Sheriff of Essex County. All claims against Crowley, Cousins, and the City of Gloucester dropped out of the case before trial. The jury found Eastman and Earle not liable.

> a) Did Mr. Ciolino fail to comply with any orders from law enforcement officers immediately prior to his arrest?
>
> b) Did the Defendants have probable cause to arrest Mr. Ciolino on the night in question?
>
> c) Was Mr. Ciolino taunting or inciting any of the [K-9] dogs immediately prior to his arrest?

The jury chose not to answer Question 3(d):

> d) Was Mr. Ciolino inciting the surrounding crowd immediately prior to his arrest?

The district court had instructed the jury to "leave [Question 3(d)] blank" if they could not agree on a yes or no answer.

On January 25, 2016, the jury found Eastman and Earle not liable and found Gikas liable as to the § 1983 excessive force claim. The jury awarded Ciolino $140,000 in damages.

On August 4, 2016, in a written order, the district court denied Gikas's post-verdict motion for qualified immunity.[4] Viewing the record in the light most favorable to the verdict, the district court held that Ciolino had "posed no immediate threat to the safety of the crowd, the officers, or the [K-9] dogs," Ciolino, 2016 WL 4148197, at *4; that Ciolino's criminal offense (if any) had been minor and had involved neither violence nor resistance to arrest, id. at *5; and that the situation outside the Club had not been so "volatile" or so "rapidly escalating" as to justify a sudden and aggressive police response, id. The court concluded

---

[4] At the close of the plaintiff's case, the district court had reserved a ruling on the defendants' motion until after the jury's verdict. See Fed. R. Civ. P. 50.

- 8 -

"that, at the time of the incident on June 30, 2013, it was clearly established that forcibly throwing a suspect to the ground for purposes of making an arrest would constitute excessive force" in such circumstances. Id. The court cited three First Circuit cases, decided before the incident, to support that holding. See Raiche, 623 F.3d at 39; Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009); Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 346, 353 (1st Cir. 1995).

## II. Special Jury Question 3(d)

Question 3(d) on the verdict form asked the jury whether Ciolino was "inciting the surrounding crowd immediately prior to his arrest." During its deliberations, the jury sent the district court a question concerning Question 3(d): "Please define 'incited.' Are we being asked if Mr. Ciolino was attempting to incite the crowd or if he was successful in inciting the crowd?"

Gikas's counsel argued that the word should be defined for the jury as including "attempt[ing] to incite," and that, regardless, the jury should be required to answer the question. The district court chose not to offer a definition to the jury, reasoning that no definition had been offered during jury instructions and that, in any event, the question was merely advisory. The court responded to the jury's question as follows:

> Question 3(d) asks you to make certain factual findings as the finders of fact. And if you can make that factual finding consistent with

> the rest of my instructions, you should make it.
>
> If you are unable to come to an agreement on that one question, please leave it blank.

Gikas argues on appeal that the district court erred by declining to clarify the definition of "incited" and by allowing the jury not to answer Question 3(d). We review each of those two decisions for abuse of discretion. See Uphoff Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir. 2010) (applying abuse of discretion review to "claimed errors in instructions' form or wording" and to "preserved objections to special verdict forms"); Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 134 (1st Cir. 2004) ("To determine whether the issues were fairly presented to the jury, we examine the court's instructions and the wording of the verdict form as a whole.").

The district court permissibly exercised its discretion by declining to provide a definition of "incited," which is not a word "outside of [an ordinary] juror's understanding." United States v. Fulmer, 108 F.3d 1486, 1495 (1st Cir. 1997); see also United States v. Stefanik, 674 F.3d 71, 74 (1st Cir. 2012) (stating that the district court "was not compelled to give a definition [of the word 'intimidate'] even when the jury requested one").

The district court also acted within its discretion when it allowed the jury not to answer the advisory Question 3(d). District courts may submit "special interrogatories to the jury"

- 10 -

in order to elicit factfinding that is relevant to the court's legal conclusion on qualified immunity. Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 34 n.9 (1st Cir. 2002) (quoting St. Hilaire v. City of Laconia, 71 F.3d 20, 24 n.1 (1st Cir. 1995)). District courts are not required to pose any such questions.

In our view -- and in the district court's view -- an answer to Question 3(d) was not necessary to the jury's liability findings. Nor was an answer necessary to the district court's qualified immunity ruling. Indeed, the district court confirmed that its immunity holding "would have been the same if the special questions had not been posed." Ciolino, 2016 WL 4148197, at *6 n.3.

### III. Qualified Immunity

We review de novo "the district court's denial of a post-verdict motion for judgment as a matter of law under Rule 50," and we "view[] the evidence in the light most favorable to the verdict." Kennedy v. Town of Billerica, 617 F.3d 520, 527 (1st Cir. 2010). In qualified immunity analysis, both elements (described below) of the question of whether the law was clearly established are legal determinations, entitled to de novo review. See Stamps v. Town of Framingham, 813 F.3d 27, 33, 39 (1st Cir. 2016) (citing Elder v. Holloway, 510 U.S. 510, 516 (1994)); Decotiis v. Whittemore, 635 F.3d 22, 36–37 (1st Cir. 2011).

- 11 -

A.    Qualified Immunity Framework

Qualified immunity protects public officials from § 1983 suits for damages if their actions "d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  White v. Pauly, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam)).

The Supreme Court has repeatedly emphasized qualified immunity's importance -- particularly "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'"  Id. at 552 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)); see also, e.g., City & County of San Francisco v. Sheehan, 135 S. Ct. 1765, 1776 (2015) ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures.").  We must analyze whether the law is clearly established "in light of the specific context of the case, not as a broad general proposition."  Hunt v. Massi, 773 F.3d 361, 367 (1st Cir. 2014) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)).

Graham v. Connor, 490 U.S. 386 (1989), and Tennessee v. Garner, 471 U.S. 1 (1985), provide the "general tests" for Fourth Amendment excessive force claims.  Brosseau, 543 U.S. at 199.  They set forth three criteria for evaluating the reasonableness of force

used: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (citing Garner, 471 U.S. at 8-9). Although Graham and Garner "guide us in determining the law in many different kinds of circumstances," those precedents are "cast at a high level of generality" and do not necessarily establish the "clear law . . . that would apply" to any given set of circumstances, outside of the most "obvious case[s]." Brosseau, 543 U.S. at 199 (citation omitted). As we apply the Graham factors, we must look also to "clearly established law" that is "'particularized' to the facts of the case." White, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)); accord Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014).

We undertake a two-step inquiry in qualified immunity cases, asking "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Stamps, 813 F.3d at 34 (quoting Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011)). In this case, the jury has already found that Gikas violated Ciolino's Fourth Amendment right to be free from excessive force. Gikas has not challenged the sufficiency of the evidence supporting

- 13 -

that verdict, either in his post-verdict motion in the district court or before us.

As a result, we address the second prong: whether the right that Gikas violated was "clearly established" at the time Gikas acted.  Id. (quoting Mlodzinski, 648 F.3d at 32).  "The second prong, in turn, has two elements: 'We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right.'"  Id. (quoting Mlodzinski, 648 F.3d at 32–33).

The first element of prong two is easily satisfied.  The legal contours of Ciolino's right were clear and a reasonable officer would have had "clear notice" of it.  Mlodzinski, 648 F.3d at 33 (quoting Decotiis, 635 F.3d at 37); see also, e.g., Morelli, 552 F.3d at 23–24 ("Our case law supplies a crystal clear articulation of the right . . . to be free from the use of excessive force by an arresting officer.").  Gikas focuses his argument on the second element of prong two: whether a reasonable officer would have understood that Gikas's actions were unconstitutional under the particular circumstances he confronted.  See Mlodzinski, 648 F.3d at 33; see also Decotiis, 635 F.3d at 36–37 (explaining that the second element of prong two "requir[es] a legal determination"

- 14 -

but "is highly fact specific" (quoting Estrada v. Rhode Island, 594 F.3d 56, 63 (1st Cir. 2010))).

B.     Analysis of Second Element of Second Qualified Immunity Prong

We agree with the district court that a reasonable officer in Gikas's position "would have understood that what he [wa]s doing violate[d]" Ciolino's Fourth Amendment right. al-Kidd, 563 U.S. at 741 (quoting Anderson, 483 U.S. at 640).

We review briefly three cases, each of which predates Gikas's actions in June 2013. In our view, these precedents embody "a robust 'consensus of cases of persuasive authority,'" id. at 742 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)), such that a reasonable officer would have recognized "the violative nature of [Gikas's] particular conduct," id.

Raiche v. Pietroski is most closely on point. Two police officers, including defendant Pietroski, signaled plaintiff Raiche to stop by using their cruiser's overhead lights when they saw him driving a motorcycle without a helmet. 623 F.3d at 33–34. Raiche did not immediately stop. Id. When Raiche did pull over, Pietroski ran immediately from his cruiser toward Raiche and tackled him, taking him off the motorcycle. Id. at 34. A jury later found that Pietroski had used excessive force. Id. at 35. "[G]iven the jury's resolution of the facts," id. at 36, we affirmed the district court's post-verdict denial of qualified immunity. Id. at 35–36.

Raiche, like Ciolino, disobeyed a police order but showed no inclination to resist arrest or to attempt to flee from arrest. See id. at 37. Like Ciolino, he "present[ed] no indications of dangerousness." Id. at 39. Like Ciolino, he was not given a chance to submit peacefully to arrest before significant force was used to subdue him. See id. at 39 & n.3. And in Raiche, as here, the defendant officer had no need to make "split-second judgments" in response to "tense, uncertain, and rapidly evolving" circumstances. Id. at 39 (quoting Graham, 490 U.S. at 396). Rather, an "objectively reasonable police officer" would have taken a more measured approach. Id.

Morelli v. Webster and Alexis v. McDonald's Restaurants of Massachusetts, Inc. further illustrate the application of Graham's general excessive force principles in a situation analogous to the one before us. In Morelli, the plaintiff was detained in a hotel corridor with force sufficient to tear her rotator cuff, despite the fact that she had committed a minor crime, at most, and showed no "evidence of either dangerousness or attempted flight." 552 F.3d at 24. In Alexis, after the plaintiff refused an officer's orders to leave a restaurant, see 67 F.3d at 345-46, the officer "suddenly and violently grabbed and pulled [the plaintiff] bodily from the booth and across the table," id. at 346. In each case, viewing the record in the plaintiff's favor at the summary judgment stage, we reversed the district court's

grant of qualified immunity, finding the defendant officer's actions not only unconstitutional but also "outside the universe of protected mistakes," Morelli, 552 F.3d at 24, that a reasonable officer might have made under the circumstances. See id. at 25; Alexis, 67 F.3d at 353.

Seeking to persuade us that his judgment calls, even if mistaken, were those of a reasonable officer, Gikas argues that the scene outside the Club was so volatile that he was "forced to make [a] split-second judgment[]," Graham, 490 U.S. at 397, about how much force was warranted. Gikas testified that he arrested Ciolino in the way he did because Ciolino "was inciting the crowd," and so Gikas "needed to get [Ciolino] away from the crowd in order to gain control over it."

The record before us does not support Gikas's argument that he had to make a split-second judgment and that the atmosphere outside the Club was so highly combustible that he had to arrest Ciolino as he did. The video, although it captures only 24 seconds, refutes Gikas's argument. Notably, the video shows that Sergeant Pickles, the officer whose dog Ciolino taunts just before the arrest, barely reacts to Ciolino's behavior and certainly does not treat Ciolino as a threat. Nor do the other officers on the scene. And no officer on the scene testified that Ciolino was posing an immediate threat of violence and had to be removed. Even Gikas himself testified that he did not perceive Ciolino as an

active threat; rather, his goal in removing Ciolino forcibly from the sidewalk was to prevent Ciolino from having an "opportunity to [incite] the crowd," which "could instigate a larger problem."

The cases cited by Gikas involve plainly distinguishable circumstances. In one set of cases, the officers claiming immunity faced much more volatile and dangerous scenes than the one Gikas confronted, and the persons against whom force was used posed a greater threat to the safety of the officers and others than Ciolino did. See, e.g., Asociación de Periodistas de P.R. v. Mueller, 680 F.3d 70, 74-75 (1st Cir. 2012) (granting immunity where video of incident showed a "rapid deterioration of the situation" and "physical confrontation[s]" as officers were attempting to disperse crowd); Fils v. City of Aventura, 647 F.3d 1272, 1290-91 (11th Cir. 2011) (granting immunity to officer for slamming plaintiff to ground, where plaintiff's own testimony indicated that "the crowd outside the club became significantly more hostile to the police after [a co-plaintiff] was tased," and plaintiff had taken a step toward officer, whose back was turned, while screaming at him); Salazar v. City of New York, No. 15-cv-1989 (KBF), 2016 WL 3748499, at *1 (S.D.N.Y. July 11, 2016) (granting immunity to officers who had acted in response to a "loud and physical . . . brawl" involving the plaintiff, adjacent to a crowd outside a bar in midtown Manhattan); Estate of Devine v. Fusaro, No. 3:14-cv-01019 (JAM), 2016 WL 183472, at *1-3 (D. Conn.

- 18 -

Jan. 14, 2016) (granting immunity to officers for actions aimed at ending unpredictable and dangerous standoff with armed and suicidal man), aff'd, No. 16-414-cv, 2017 WL 362685 (2d Cir. Jan. 23, 2017) (unpublished summary order).

A second set of Gikas's cases, which overlaps in part with the first set, is distinguishable for another reason: they involved arrestees who had physically resisted, or were actively resisting, arrest. See, e.g., Salazar, 2016 WL 3748499, at *2, *6 (granting immunity for pepper-spraying plaintiff who had been "kicking and screaming" during her arrest); Brown v. City of New York, No. 13-cv-1018 (KBF), 2016 WL 1611502, at *1–2 (S.D.N.Y. Apr. 20, 2016) (granting immunity for pepper-spraying plaintiff who had refused to offer her hands for handcuffing);[5] Therrien v. Town of Jay, 483 F. Supp. 2d 19, 26–27 (D. Me. 2007) (granting immunity for forceful takedown after a lengthy car chase, in which

---

[5] Gikas also argues that Brown stands for the principle that "even when a jury or judge finds force excessive, where the issue of qualified immunity is a close call, it should fall in favor of the police officers." There is no such rule in the Second Circuit, and certainly not in the First Circuit. Brown merely reiterates that if reasonable minds could disagree as to the first prong of qualified immunity -- that is, whether there was a constitutional violation at all -- a defendant will ordinarily be entitled to immunity on the second prong. That language restates the familiar principle that qualified immunity gives "a reasonable officer . . . the benefit of a margin of error." Mlodzinski, 648 F.3d at 33 (quoting Morelli, 552 F.3d at 24).

arrestee ignored numerous orders to stop, was clearly intoxicated, and generally acted in an "irrational and unpredictable fashion").[6]

Finally, we reject Gikas's argument that he acted in a manner consistent with his training and police protocol when he took Ciolino to the ground with force. Cf. Stamps, 813 F.3d at 32 n.4 (discussing the relevance of "police training and procedures" to a qualified immunity inquiry in an excessive force case). Gikas testified at trial that he had been taught to employ "open-hand" techniques to subdue arrestees who have refused to obey verbal commands and that he used such a technique on Ciolino, rather than a more extreme use of force, after perceiving that Ciolino had refused police instructions to "move along" and to leave the K-9 dogs alone.

If anything, Gikas's actions appear to be contrary to the training he says he received on the spectrum of police responses. A reasonable officer might well have laid hands on Ciolino, either to arrest him or to remove him, but would have used a less aggressive technique, such as seizing and securing

---

[6] Murphy v. Palmer, brought to our attention at oral argument, could be placed into both sets of cases. No. 14-cv-6896 (FLW) (DEA), 2017 WL 2364195 (D.N.J. May 31, 2017) (unpublished opinion). In Murphy, a forceful arrest was held to be reasonable because the "belligerent and noncompliant" plaintiff attempted to retreat when told he was under arrest, "it was unclear whether [he] posed an imminent threat to the safety of the [o]fficers," and "[t]he circumstances were tense and rapidly escalating." Id. at *13.

Ciolino's hands, rather than taking the actions Gikas did.  The record contains no evidence that Gikas was trained to "jump[] immediately to the extreme end of the 'open-hand' force category," Raiche, 623 F.3d at 39, rather than to control Ciolino with a less forceful technique.  Nor is there any evidence that Gikas was trained to regard a disobeyed order to "move along" as equivalent to a disobeyed order to submit to arrest.  See id. at 37-38; Alexis, 67 F.3d at 345-46, 353.  Gikas gave Ciolino no warning at all that he was under arrest before Gikas decided to use force.

We conclude, as did the district court, that Gikas's actions not only violated Ciolino's Fourth Amendment right but also fell outside the "margin of error," Morelli, 552 F.3d at 24, that qualified immunity provides.

## IV. Conclusion

The denial of qualified immunity and the judgment are affirmed.