# United States Court of Appeals
## For the First Circuit

No. 15-1141

EURIE A. STAMPS, JR., Co-administrator of the Estate of Eurie A. Stamps, Sr.; NORMA BUSHFAN-STAMPS, Co-administrator of the Estate of Eurie A. Stamps, Sr.,

Plaintiffs, Appellees,

v.

TOWN OF FRAMINGHAM; PAUL K. DUNCAN, individually and in his official capacity as a police officer of the Framingham Police Department,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

Leonard H. Kesten, with whom Thomas R. Donohue, Deidre Brennan Regan, and Brody, Hardoon, Perkins & Kesten, LLP were on brief, for appellants.
Anthony Tarricone, with whom Joseph P. Musacchio, Kreindler & Kreindler, LLP, Anthony W. Fugate, and Bardouille and Fugate were on brief, for appellees.
Matthew R. Segal, Adriana Lafaille, Ezekiel Edwards, Ilya Shapiro, Benjamin Crump, Juan Cartagena, Jose Perez, Bradford M. Berry, and Anson Asaka, on brief for the American Civil Liberties Union, American Civil Liberties Union of Massachusetts, Cato Institute, National Bar Association, LatinoJustice PRLDEF, and

National Association for the Advancement of Colored People -- New England Area Conference, amici curiae in support of appellees.

February 5, 2016

**LYNCH**, **Circuit Judge**.  This civil rights case brought under 42 U.S.C. § 1983 arises from the tragic shooting death of an innocent, elderly, African-American man, Eurie Stamps, Sr.  He was shot by a local police officer, Paul Duncan, during a SWAT team raid executing a search warrant for drugs and related paraphernalia belonging to two drug dealers with violent criminal histories thought to reside in Stamps's home.

The co-administrators of Stamps's estate sued the Town of Framingham and Duncan.  The plaintiffs argue that Duncan violated Stamps's Fourth Amendment right against unreasonable seizure when he pointed a loaded semi-automatic rifle at Stamps's head, with his finger on the trigger and the safety off.  Duncan did so even though Stamps had been subdued, was lying in a hallway on his stomach with his hands above his head, and was compliant and posed no known threat to the officers.  Duncan moved for summary judgment on the ground that he was entitled to qualified immunity because the shooting was an accident and, in any event, not a violation of clearly established law.  The district court denied the motion, holding that a reasonable jury could find that Duncan had violated Stamps's Fourth Amendment rights and that the law was sufficiently clearly established to put Duncan on notice that pointing a loaded firearm at the head of an innocent and compliant person, with the safety off and a finger on the trigger,

is not constitutionally permissible.  <u>Stamps</u> v. <u>Town of Framingham</u>, 38 F. Supp. 3d 146, 151–58 (D. Mass. 2014).  Duncan appealed.

We agree with the district court and affirm the denial of the defendants' motion for summary judgment on qualified immunity.

I.

The parties do not dispute that we properly have interlocutory jurisdiction.  The defendants have accepted, as they did in the district court on summary judgment, that all inferences from the record are drawn in the plaintiffs' favor.  <u>See</u> <u>Mlodzinski</u> v. <u>Lewis</u>, 648 F.3d 24, 27 (1st Cir. 2011) ("An interlocutory appeal from a denial of summary judgment on qualified immunity grounds lies only if the material facts are taken as undisputed and the issue on appeal is one of law.").

After midnight on January 5, 2011, a group of approximately eleven SWAT team members executed a search warrant at a first floor apartment in Framingham, Massachusetts.  Eurie Stamps, Sr., the decedent; Norma Bushfan-Stamps, his wife; and Joseph Bushfan, his stepson, lived in the apartment.  The search warrant identified another man, Dwayne Barrett, as also occupying the apartment.  The warrant was issued on probable cause that Bushfan and Barrett were selling crack cocaine out of the apartment.  A third man, Deandre Nwaford, though not mentioned in the warrant, was thought to be an associate of Bushfan and Barrett,

- 4 -

and the police believed he might be in the apartment as well. The Framingham Police Department suspected all three men of having ties to Boston gangs and criminal histories collectively including armed robbery, armed assault, assault with a dangerous weapon, assault and battery with a dangerous weapon, theft of a firearm, and cocaine-related charges. The warrant authorized a nighttime search of the premises for drugs and related paraphernalia, but did not authorize unannounced entry or command search of any person found who might have such property in his possession.

Before the raid, the SWAT team was briefed on the layout of the apartment and the criminal histories of the occupants. During this briefing, the SWAT team members were told that Stamps, who was likely to be present in the apartment, was sixty-eight years old and that his criminal record only consisted of "motor vehicle arrests/charges." Stamps was not suspected of any involvement in the illegal activity underlying the search warrant or of any crime. The SWAT team members were also instructed that Stamps had no history of violent crime or of owning or possessing a weapon and that he posed no known threat to the officers executing the warrant.

The raid began just after midnight.[1] After the officers announced their presence, one team of officers set off a flash-

---

[1] Shortly before the raid began, Joseph Bushfan was apprehended outside of the apartment.

bang grenade through the kitchen window, while another team, including Duncan, breached the apartment with a battering ram. Upon entering, Duncan switched the selector on his loaded M-4 rifle from "safe" to "semi-automatic."

Two other SWAT team members, Officers Timothy O'Toole and Michael Sheehan, encountered Stamps first, in a hallway that separated the kitchen from the bathroom and a rear bedroom. The officers ordered Stamps to "get down," and he complied by lying down on his stomach with his hands raised near his head. A series of officers stepped over Stamps to go elsewhere in the apartment. Duncan, who had been ordered by a sergeant to assist O'Toole and Sheehan as a "trailer," assumed control of Stamps while O'Toole and Sheehan continued searching and clearing the apartment.

Stamps remained prostrate on the hallway floor. Duncan pointed his rifle at Stamps's head as Stamps lay in the hallway. The rifle's safety was still disengaged and set to "semi-automatic." Duncan said nothing to Stamps. At some point, Duncan placed his finger on the trigger.[2] The search continued in the

---

[2]     The defendants have accepted, for purposes of this appeal, the plaintiffs' statement of facts. Further, on review of summary judgment, we are required to "draw[] all reasonable inferences in the light most favorable to the nonmoving party." Mitchell v. Miller, 790 F.3d 73, 76 (1st Cir. 2015). Given that the defendants do not assert that the gun malfunctioned or fired without Duncan pulling the trigger, it is also reasonable to infer that Duncan, at some point before shooting Stamps, placed his finger on the trigger.

apartment. Sometime before the shooting, a young man found in the rear bedroom, Devon Talbert, was detained. He was not one of the suspects the police expected to find there. The record before us simply does not tell us what the status of the search was for Barrett and Nwaford.

While the other officers continued to search elsewhere in the apartment, Duncan was pointing a loaded, semi-automatic rifle, with the safety off and his finger on the trigger, at Stamps. Stamps was fully complying with the orders he was given, was unarmed and flat on his stomach in the hallway, and constituted no threat. At some point, Duncan unintentionally pulled the trigger of his rifle and shot Stamps.[3] The shot was an accident; Duncan had no intention of shooting Stamps. The bullet pierced Stamps's head, neck, and chest. Stamps was taken by ambulance to a hospital and pronounced dead. Duncan was later dismissed from the SWAT team for failing to abide by police training and protocols.

---

[3] The plaintiffs maintain that Duncan pulled the trigger while standing upright. Duncan, meanwhile, asserts that the rifle discharged when he lost his balance and fell back. This happened, he says, because, fearing that Stamps might reach for a weapon, he attempted to move Stamps's hands behind his back in order to handcuff him. However, the plaintiffs presented expert testimony that Duncan's description was "implausible, highly unlikely and inconsistent with the evidence." (capitalization omitted). In any event, the defendants have agreed to accept the plaintiffs' version for purposes of the appeal.

According to expert testimony, Duncan committed three errors during his seizure of Stamps that violated police rules, including Framingham rules, his training, and general firearms protocol.[4]  First, accepting for purposes of this appeal that he

────────────────

[4]      The defendants argue that we may not consider police training and procedures in determining whether there was a Fourth Amendment violation.  We disagree.  Such standards do not, of course, establish the constitutional standard but may be relevant to the Fourth Amendment analysis.  We have approved the taking of evidence about police training and procedures into consideration. See, e.g., Fernández-Salicrup v. Figueroa-Sancha, 790 F.3d 312, 327 (1st Cir. 2015) (considering "standard police practice"); Raiche v. Pietroski, 623 F.3d 30, 37 (1st Cir. 2010); Jennings v. Jones, 499 F.3d 2, 11–16, 19–20 (1st Cir. 2007) (noting that evidence regarding officer training "is relevant both to the . . . question of whether there was a violation at all and to the . . . question . . . of whether a reasonable officer in [the defendant's] circumstances would have believed that his conduct violated the Constitution," id. at 19–20); Calvi v. Knox Cty., 470 F.3d 422, 428 (1st Cir. 2006).  So have other courts.  See, e.g., Young v. Cty. of L.A., 655 F.3d 1156, 1162 (9th Cir. 2011); Torres v. City of Madera, 524 F.3d 1053, 1057 (9th Cir. 2008) (agreeing that the following "factors [had been] relevant to the reasonableness determination" in a case where an officer unintentionally fired his pistol when he meant to fire his Taser: "(1) the nature of the training the officer had received to prevent incidents like this from happening; (2) whether the officer acted in accordance with that training; (3) whether following that training would have alerted the officer that he was holding a handgun; (4) whether the defendant's conduct heightened the officer's sense of danger; and (5) whether the defendant's conduct caused the officer to act with undue haste and inconsistently with that training" (citing Henry v. Purnell, 501 F.3d 374, 383 (4th Cir. 2007))); Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1059 (9th Cir. 2003) ("Although . . . training materials are not dispositive, we may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable.").  But see, e.g., Moreno v. Taos Cty. Bd. of Comm'rs, 587 F. App'x 442, 446 (10th Cir. 2014); Thompson v. City of Chi., 472 F.3d 444, 453–55 (7th Cir. 2006).

        To be clear, we do not mean to suggest that such evidence is necessary -- or sufficient -- to establish a Fourth Amendment

placed his finger on the trigger, Duncan concedes that he violated his training and Framingham Police Department protocol by doing so. According to Framingham Police Department policy in place at the time, officers were required to "keep their finger[s] outside of the trigger guard until ready to engage and fire on a target." Framingham police officers, including Duncan, were trained on this policy.

Second, Duncan deviated from "proper, reasonable, established, and accepted police practices and procedures" and "his training by having his weapon 'off safe' at all times when he encountered Mr. Stamps. The training provided to Officer Duncan by the [Framingham Police Department] required that his weapon be 'on safe' unless he perceived Mr. Stamps as a threat or was actively clearing a room."[5] We accept for the purposes of this appeal that neither was the case here.

---

violation, see Jennings, 499 F.3d at 20 n.24, or that compliance with police protocols and training necessarily renders an officer's conduct reasonable, see Smith v. Kan. City, Mo. Police Dep't, 586 F.3d 576, 581–82 (8th Cir. 2009).

[5] This is according to one of the plaintiffs' experts, Kim Widup. The parties dispute whether it was appropriate for Duncan to have the safety off on his rifle. The defendants note that one of the plaintiffs' experts, James Gannalo, opined that not engaging the gun's safety was a "judgment call." Because of the posture of this appeal, we assume facts in the light most favorable to the plaintiffs. See Mitchell, 790 F.3d at 76. As such, we are satisfied that a jury could find on these facts that Duncan deviated from his training and standard police practice when he turned off his rifle's safety.

- 9 -

Third, Duncan additionally violated "basic firearm safety procedures" and "departmental guidelines" by "fail[ing] to keep the weapon's muzzle pointed in a safe direction at all times." (emphasis omitted).[6]

## II.

On October 12, 2012, Norma Bushfan-Stamps and Eurie Stamps, Jr., Stamps's son, as the co-administrators of Stamps's estate, brought suit on behalf of the estate against Duncan and the Town of Framingham. They brought ten claims, including claims

---

[6] This is according to the plaintiffs' expert, James Gannalo. Widup similarly opined that "[i]n direct violation of [Framingham Police Department] protocol, his training, and reasonable and customary police weapons practices and procedure, Officer Duncan failed to point his rifle's muzzle in a safe direction when he stood in the kitchen and encountered Mr. Stamps."

The defendants' representations to the contrary in their Rule 28(j) letter are flatly repudiated by the record. We expect better from counsel.

Even considering Duncan's version of the facts, in which the potential threat he perceived may have justified training the rifle on Stamps, the plaintiffs have produced expert testimony that Duncan should not have attempted to handcuff Stamps while covering him with the rifle, but instead should have maintained his position as cover officer and called someone to help, a technique known as "contact/cover." Widup opined that, even on Duncan's version of the facts, "Duncan deviated from his training and standard and reasonable police procedure by failing to utilize the contact/cover procedure." That was also the view of Sergeant Vincent Stuart and Lieutenant Robert Downing, both of whom participated in the raid. The training Duncan received required this, as admitted by Police Chief Steven Carl. And this is precisely what the officers who seized Devon Talbert did when they found him in the bedroom. Although this evidence certainly is not determinative of the Fourth Amendment inquiry, we are likewise satisfied here, as with the evidence discussed above, that a jury could find on these facts that Duncan violated standard police procedure.

under § 1983 against Duncan for violations of both the Fourth and Fourteenth Amendments, a claim under § 1983 against the Town of Framingham for negligent training and supervision, and claims of wrongful death under Massachusetts law against Duncan and the Town of Framingham.

The defendants moved for summary judgment on all but one of the claims, a state-law wrongful death claim against the Town of Framingham. Summary judgment was granted to the defendants on seven of the nine counts, leaving two § 1983 claims against Duncan predicated on violations of the Fourth Amendment. In pressing for summary judgment on these two counts, the defendants had argued that Duncan was entitled to qualified immunity because 1) an unintentional shooting does not violate the Fourth Amendment, and 2) even if there were a Fourth Amendment violation, the law had not clearly established that his conduct constituted such a violation.

The district court disagreed and denied Duncan's motion as to those two claims. See Stamps, 38 F. Supp. 3d at 151–58. This appeal followed.

III.

We review de novo the district court's denial of summary judgment on qualified immunity grounds. Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 60 (1st Cir. 2004); cf. Lopera v. Town of Coventry, 640 F.3d 388, 395 (1st Cir. 2011) (noting that the same

standard applies to a grant of summary judgment on qualified immunity grounds).

The rules for granting qualified immunity are well established. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Id. (quoting Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)).

This court adheres to a two-step approach to determine whether a defendant is entitled to qualified immunity: "We ask '(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation.'"[7] Mlodzinski, 648 F.3d at 32 (quoting

---

[7]    At this stage of the litigation, we do not have "jurisdiction to decide whether any constitutional violations actually occurred or to resolve any factual disputes necessary to make that determination." Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). Rather, accepting the facts in the light most favorable to the plaintiffs, as we must, we have jurisdiction to determine whether "the plaintiffs have . . . stated cognizable constitutional violations," and "whether the constitutional rights . . . allegedly violated were clearly established at the time." Id. In this posture, an officer is entitled to qualified immunity

Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)). The second prong, in turn, has two elements: "We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." Id. at 32-33.

Following this framework, the district court held on prong one that "[e]ven the unintentional or accidental use of deadly force in the course of an intentional seizure may violate the Fourth Amendment if the officer's actions that resulted in the injury were objectively unreasonable." Stamps, 38 F. Supp. 3d at 152. The court then found that "there are substantial issues as to the reasonableness of Duncan's conduct as a whole," id. at 153, emphasizing the low risk posed by Stamps and the high risk created by Duncan aiming his rifle at Stamps's head with the safety off and his finger on the trigger, id., and concluded that "a reasonable jury could find that Duncan's actions leading up to the shooting were objectively unreasonable, and therefore that he

_____

"[i]f even on plaintiffs' best case, there is no violation of their rights, or the law was not clearly established, or an objectively reasonable officer could have concluded (even mistakenly) that his or her conduct did not violate their rights." Mlodzinski, 648 F.3d at 28.

employed excessive force in violation of the Fourth Amendment," id. at 154. We agree.

On prong two, the district court stated that "it was clearly established at the time of the incident that the unintentional or accidental use of deadly force during a seizure can give rise to a constitutional violation if the officer has acted unreasonably in creating the danger." Id. The court then found that the law was clearly established such that Duncan would have been on notice that his conduct violated the Fourth Amendment, and accordingly denied Duncan's plea for summary judgment on qualified immunity. Id. at 154–58. Again, we agree.

IV.

A jury could reasonably find that Duncan violated Stamps's Fourth Amendment rights. The defendants' primary argument, in fact what appears to be their principal reason for taking this interlocutory appeal, is that Duncan's actions are not subject to Fourth Amendment review because the shooting itself was not intentional. We reject that argument. They then make the secondary argument that even if Duncan's actions are within the ambit of Fourth Amendment review, a jury could not find that his decision to point the rifle at Stamps's head with the safety off and his finger on the trigger was objectively unreasonable under the law.

- 14 -

One point of the Fourth Amendment is to protect an individual from a police officer's use of excessive force in effectuating a seizure.  See Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010).  Where an officer creates conditions that are highly likely to cause harm and unnecessarily so, and the risk so created actually, but accidentally, causes harm, the case is not removed from Fourth Amendment scrutiny.

To make out a Fourth Amendment excessive force claim, a plaintiff must show, as an initial matter, that there was a seizure within the meaning of the Fourth Amendment, and then that the seizure was unreasonable.  "A Fourth Amendment seizure occurs when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'"  United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)).  A person is seized by an officer's show of authority if "a reasonable person would have believed that he was not free to leave," INS v. Delgado, 466 U.S. 210, 215 (1984) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)), and he in fact submits to the officer's assertion of authority, California v. Hodari D., 499 U.S. 621, 626 (1991).  The Fourth Amendment is only implicated if the "governmental termination of freedom of movement [was] through means intentionally applied."  Brower v. Cty. of Inyo, 489 U.S. 593, 597 (1989).

Stamps was undoubtedly seized.  See Mendenhall, 446 U.S. at 554 (opinion of Stewart, J.) (citing "display of a weapon by an officer" as an "[e]xample[] of [a] circumstance[] that might indicate a seizure").  The defendants do not dispute this.  No reasonable person could possibly have felt free to leave with an assault rifle pointed directly at his head.  And Stamps submitted to Duncan's show of authority by remaining prostrate on the ground with his hands in the air.

The defendants, however, argue that, as a matter of law, the Fourth Amendment does not apply to Duncan's conduct because the shooting itself was unintentional, and thus not "means intentionally applied," Brower, 489 U.S. at 597 (emphasis omitted).  The heart of their argument is that regardless of Duncan's actions leading up to the moment he pulled the trigger, the inadvertence of the shot shields him from Fourth Amendment scrutiny.

We cannot agree.  The defendants' proposed rule has the perverse effect of immunizing risky behavior only when the foreseeable harm of that behavior comes to pass.[8]

_____

    [8]    Consider, for example, what would have happened had everything else been the same but for the last act: the gun was not fired.  Whether or not it was found to be a Fourth Amendment violation, there is no question that Duncan's conduct would be susceptible to Fourth Amendment scrutiny.  See Mlodzinski, 648 F.3d at 38.  Stamps could have brought a § 1983 claim just as the plaintiffs did in Mlodzinski, and the case would have proceeded as normal.  It makes no sense, then, to find that the exact same

The Supreme Court's opinion in <u>Brower</u> illustrates precisely why the defendants' reasoning is flawed.  In <u>Brower</u>, the police were engaged in a high-speed chase with a suspect, Brower, who was driving a stolen vehicle.  <u>Id.</u> at 594.  In an effort to stop him, the police positioned "an 18-wheel tractor-trailer . . . across both lanes of a two-lane highway in the path of Brower's flight," "concealed[] this roadblock by placing it behind a curve and leaving it unilluminated," and "positioned a police car, with its headlights on, between Brower's oncoming vehicle and the truck, so that Brower would be 'blinded' on his approach."  <u>Id.</u>  Brower was killed when he crashed into the tractor-trailer, and his heirs brought a § 1983 claim against the county.  <u>Id.</u>

The Court faced the question whether the use of the roadblock constituted a seizure within the meaning of the Fourth Amendment.  The guiding principle identified by the Court was that a seizure only occurs "when there is a governmental termination of freedom of movement <u>through means intentionally applied</u>."  <u>Id.</u> at 597.  Finding that the use of the roadblock was a "means intentionally applied," the Court stated:

> In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun

conduct becomes unreviewable because Duncan accidentally fired the gun.

- 17 -

> with which he was meant only to be bludgeoned,
> or by a bullet in the heart that was meant
> only for the leg. <u>We think it enough for a
> seizure that a person be stopped by the very
> instrumentality set in motion or put in place
> in order to achieve that result.</u>

<u>Id.</u> at 598-99 (emphasis added).[9] Aware that identifying the roadblock as a seizure was not enough alone to make out a Fourth Amendment claim, the Court noted that "[p]etitioners can claim the right to recover for Brower's death only because the unreasonableness they allege consists precisely of setting up the roadblock in such manner as to be likely to kill him." <u>Id.</u> at 599.

---

[9] The defendants appear to quibble over the meaning of "instrumentality," asserting that only the display of the gun, and not the bullet, was "intentionally applied," and therefore the shooting itself is outside the Fourth Amendment. But this type of hairsplitting was plainly rejected by the Supreme Court in <u>Brower</u> when it offered the example of a suspect who is "stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned." <u>Brower</u>, 489 U.S. at 598-99. In this context, we decline to entertain the fiction that the bullet is somehow an "instrumentality" distinct from the rifle. We reject as well the defendants' attempt to draw a line between the use of a gun as a show of authority and the use of a gun to inflict physical harm. We find no reason in <u>Brower</u>, nor can we find a principled reason, to distinguish between attempting to seize someone by pointing a gun at his head, using the gun as a bludgeon, or even throwing the gun or strategically placing it such that the individual trips over it; in all of these situations the gun is "the very instrumentality set in motion or put in place in order to" seize the individual. <u>Id.</u> at 599. Indeed, the Court in <u>Brower</u> did not fret over such an argument, characterizing the tractor-trailer as "not just a significant show of authority to induce a voluntary stop, but . . . designed to produce a stop by physical impact if voluntary compliance does not occur." <u>Id.</u> at 598.

*Brower* stands for the proposition that an officer can be held liable under the Fourth Amendment for an intentional but unreasonably dangerous seizure, even when the means employed to effectuate the seizure result -- unintentionally -- in someone's death. In the wake of *Brower*, this court affirmed that "unintentional conduct [can] trigger[] Fourth Amendment liability." *Landol-Rivera* v. *Cruz Cosme*, 906 F.2d 791, 796 n.9 (1st Cir. 1990).[10] So have other circuits.

There is widespread agreement among the circuits that have addressed the issue that a claim is stated under the Fourth Amendment for objectively unreasonable conduct during the effectuation of a seizure that results in the unintentional discharge of an officer's firearm. That reasoning underlies the decisions in recent cases like *Estate of Bleck ex rel. Churchill* v. *City of Alamosa*, 540 F. App'x 866, 874–77 (10th Cir. 2013), *cert. denied*, 134 S. Ct. 2845 (2014), and *Watson* v. *Bryant*, 532 F. App'x 453, 457–58 (5th Cir. 2013) (per curiam) ("An undisputedly

---

[10] Contrary to the defendants' assertion, our opinion in *Landol-Rivera* is not inconsistent with our conclusion here. There, a police officer accidentally shot a hostage while trying to stop a fleeing felon. *Landol-Rivera*, 906 F.2d at 791–92. Resting on *Brower*'s intent requirement, we reasoned that it was not the officer's intent to seize the hostage: "It is intervention directed at a specific individual that furnishes the basis for a Fourth Amendment claim." *Id.* at 796. That holding simply has no relevance here since there is no question that Stamps was the intended target of Duncan's seizure. *Landol-Rivera* specifically "emphasize[d] that our decision does not mean that Fourth Amendment consequences may never result from unintended action." *Id.*

- 19 -

accidental shooting . . . does not end the inquiry.  [The officer] still may have violated the Fourth Amendment if he acted objectively unreasonably by deciding to make an arrest, by drawing his pistol, or by not reholstering it before attempting to handcuff [the plaintiff].").  As the en banc court stated in Henry v. Purnell, 652 F.3d 524 (4th Cir. 2011) (en banc), cert. denied, 132 S. Ct. 781 (2011), "[a]ll actions, . . . mistaken or otherwise, are subject to an objective test," id. at 532.  Of course, cases more recent than the incident do not establish pre-incident notice of clearly established rules.  But the reasoning they apply is derived from pre-2011 cases.  See Torres v. City of Madera, 524 F.3d 1053, 1056-57 (9th Cir. 2008); Henry v. Purnell, 501 F.3d 374, 379-82 (4th Cir. 2007); Tallman v. Elizabethtown Police Dep't, 167 F. App'x 459, 463 (6th Cir. 2006) ("There is no evidence from which a jury could conclude that [the officer] intentionally discharged his weapon.  We therefore focus the reasonableness inquiry on [the officer's] actions leading up to the unintentional discharge of the weapon." (citing Leber v. Smith, 773 F.2d 101, 105 (6th Cir. 1985) ("It is undisputed that [the officer] unintentionally discharged his weapon as he slipped and fell; the question is whether he acted reasonably in drawing his gun."))); Pleasant v. Zamieski, 895 F.2d 272, 276-77 (6th Cir. 1990).[11]

---

[11]    Duncan attempts to undermine the clear weight of this authority by suggesting that some of these cases involved an

The defendants point to several circuit cases that they claim stand for the opposite conclusion, most notably Dodd v. City of Norwich, 827 F.2d 1 (2d Cir. 1987). See Speight v. Griggs, 620 F. App'x 806 (11th Cir. 2015) (per curiam); Powell v. Slemp, 585 F. App'x 427 (9th Cir. 2014); Culosi v. Bullock, 596 F.3d 195 (4th Cir. 2010). They also rely on district court opinions. See, e.g., Brice v. City of York, 528 F. Supp. 2d 504 (M.D. Pa. 2007); Greene v. City of Hammond, No. 2:05-CV-83, 2007 WL 3333367 (N.D. Ind. Nov. 6, 2007); Clark v. Buchko, 936 F. Supp. 212 (D.N.J. 1996); Troublefield v. City of Harrisburg, Bureau of Police, 789 F. Supp. 160 (M.D. Pa.), aff'd, 980 F.2d 724 (3d Cir. 1992) (table decision); Glasco v. Ballard, 768 F. Supp. 176 (E.D. Va. 1991). Only one case that the defendants cite, Dodd, is a published appellate court opinion whose holding supports their position.[12]

_____

officer's intentional conduct that rested on a mistake of fact, rather than an officer's wholly unintentional conduct. The cases do not split such hairs, nor do we see any reason they should. When an officer's intentional actions in effecting a seizure create an unreasonable risk of physical harm, the Fourth Amendment has already been violated; whether it is unintended action or intended but mistaken action that ultimately actualizes the harm (or, indeed, whether no physical harm comes to pass at all) is immaterial.

[12] Culosi did not expressly hold that an accidental shooting that results from an officer's intentional use of a firearm is immune from Fourth Amendment scrutiny. Rather, the Fourth Circuit, noting that the officer's appeal centered on factual and not legal issues, dismissed the appeal for lack of jurisdiction. Culosi, 596 F.3d at 201–03. At most, the Fourth Circuit stated in dicta that the following "framing of the issue is quite correct": "[W]as the shooting death of [the plaintiff]

- 21 -

the result, on the one hand, of an intentional act by [the defendant], or, on the other hand, was it the result of a tragic and deeply regrettable, unintentional, accidental, discharge of [the defendant's] firearm?" Id. at 200. Moreover, the Fourth Circuit's subsequent en banc opinion in Henry accords with our reasoning. See Henry, 652 F.3d at 532.

Neither did Powell hold what the defendants attribute to it. There, the Ninth Circuit skipped the Fourth Amendment inquiry entirely and proceeded directly to the question of clearly established law. Powell, 585 F. App'x at 427–28. It did note, however, that since there was no evidence that the police officer intentionally shot the plaintiff, "we focus on what the district court characterized as [the plaintiff's] 'primary theory of liability' -- that [the defendant] used excessive force when he attempted to restrain [the plaintiff] with his firearm drawn," id. at 427, which would suggest that the court's views are in line with ours. The court reversed the district court's denial of summary judgment on qualified immunity because it found that there was no "existing law [that] would have made it 'sufficiently clear' to a reasonable officer in [the officer's] position that attempting to restrain [the plaintiff] with his gun drawn violated her Fourth Amendment rights," and thus the officer "was entitled to qualified immunity." Id. This holding says nothing about the Ninth Circuit's views on whether the accidental results of intentional conduct can give rise to Fourth Amendment liability. In fact, its holding in Torres would seem to suggest that it agrees with our analysis. See Torres, 524 F.3d at 1056–57.

Finally, Speight also provides little aid to the defendants. In Speight, the district court explicitly held that because "[the officer's] unintentional shooting of [the plaintiff] during the course of the arrest [did] not insulate him from liability under the Fourth Amendment," the court needed to determine "whether [the officer's] conduct leading up to the gun's accidental discharge was objectively reasonable." Speight v. Griggs, 13 F. Supp. 3d 1298, 1320–21 (N.D. Ga. 2013). But because the district court found the officer's conduct objectively reasonable, it declined to address the "clearly established" prong of the qualified immunity analysis. Id. at 1323. On appeal, the Eleventh Circuit did not address the lower court's analysis on this point. Rather, it merely stated that "[i]n this circuit, there is no clearly established right to be free from the accidental application of force during arrest." Speight, 620 F. App'x at 809 (emphasis added). In other words, Speight expressed no view on whether or not the district court's underlying constitutional analysis was sound.

We find these cases relied on by the defendants to be distinguishable in light of Brower's clear command. To be sure, both Dodd and Brower recognize that Fourth Amendment liability only attaches to intentional conduct. But to the extent that Dodd, or any of the other cases cited by the defendants, can be read for the proposition that unintended harms arising from intentional and unreasonable police conduct are never within the purview of the Fourth Amendment, they are not good law in light of Brower.[13]

Our decision today, on the other hand, flows necessarily from Brower. While in Brower "the very instrumentality set in motion" was the tractor-trailer roadblock, here it was the assault rifle. In both cases, the instrumentality was set in motion in a highly dangerous fashion, and the resulting deaths were accidents. But in neither case does -- nor should -- the accidental result of the dangerous conduct prevent Fourth Amendment review. As the Brower Court noted, the core of the plaintiffs' case "consist[ed] precisely of setting up the roadblock in such manner as to be likely to kill." Brower, 489 U.S. at 599. We need only replace

---

[13] We are not persuaded that the citation to Dodd in a footnote in Landol-Rivera signifies this circuit's adoption of Dodd. See Landol-Rivera, 906 F.2d at 796 n.9. We do not read the neutral phrase, "[c]ompare this statement in Brower with Dodd v. City of Norwich" as an endorsement of Dodd's holding. If anything, Dodd is cited in the footnote for the fact that the officer's gun had discharged after the suspect had initiated a struggle with the officer, not during the officer's effectuation of the seizure, and was therefore not within the purview of the Fourth Amendment. Id.

"setting up the roadblock" with "pointing the rifle" to arrive at the claim presented in this case.

                                    V.

        As to the defendants' second argument, we think it close to self-evident that a jury could find as a matter of fact that Duncan's actions were not reasonable, and no extensive discussion beyond what we have said is required.  The question then moves to whether the law was clearly established.  We ask "whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right," and then consider "whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right."  Mlodzinski, 648 F.3d at 32-33.  Whether the law was clearly established is itself a question of law for the court.  Elder v. Holloway, 510 U.S. 510, 516 (1994).

        In conducting this analysis, we are mindful of the Supreme Court's most recent pronouncement on this issue in Mullenix.  It cautioned the courts "not to define clearly established law at a high level of generality," and reiterated that "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'"  Mullenix, 136 S. Ct. at 308 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)).  It noted that "[s]uch specificity is especially important

in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" Id. (second alteration in original) (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001), overruled in part on other grounds by Pearson, 555 U.S. at 236). The Court explained that the "correct inquiry" in the Fourth Amendment context is "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [she] confronted.'" Id. at 309 (alteration in original) (quoting Brosseau v. Haugen, 543 U.S. 194, 200 (2004) (per curiam)).

We believe that the state of the law was clear such that a reasonable officer in Duncan's position would have understood that pointing his loaded assault rifle at the head of a prone, non-resistant, innocent person who presents no danger, with the safety off and a finger on the trigger, constituted excessive force in violation of that person's Fourth Amendment rights.[14] In

---

[14] As to the Brower issue, we need not belabor what we have just said. We do not believe that Dodd, which was decided before Brower, or a smattering of district court cases rendered the law unclear on this point. See Camreta v. Greene, 131 S. Ct. 2020, 2033 n.7 (2011) ("[D]istrict court decisions -- unlike those from the courts of appeals -- do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity," and therefore "[m]any Courts of Appeals . . . decline to consider district court precedent when determining if constitutional rights are clearly established for purposes of qualified immunity.").

concluding that this case must go to a jury for determination, we rely on Brower and on our prior circuit precedent, and we confirm our ruling by observing that clearly settled Fourth Amendment law as of the time of Stamps's death fully cohered with commonly accepted precepts on appropriate use of firearms and appropriate police procedures.

Our opinion in Mlodzinski speaks directly to this issue. There, we affirmed the denial of summary judgment on qualified immunity to officers who, in 2006, detained two innocent and compliant women at gunpoint during a late-night police raid executing a search warrant, issued on probable cause to believe that the seventeen-year-old boy who lived at the women's residence had severely beaten another boy with an expandable nightstick.[15] Mlodzinski, 648 F.3d at 29–31. The first woman, the fifteen-year-old sister of the suspect, was shoved to the floor, handcuffed, and "detained with an assault rifle held to her head for seven to ten minutes." Id. at 37. We found that "[a] reasonably competent officer . . . would not have thought that it was permissible to point an assault rifle at the head of an innocent, non-threatening, and handcuffed fifteen-year-old girl for seven to ten minutes, far

---

[15]   Mlodzinski was decided on June 2, 2011, five months after Stamps's death, and so was obviously not on the books at the time of the shooting.  However, we denied qualified immunity in Mlodzinski because we found that the law was clearly established on the facts of that case as of, at least, August 2, 2006, the date of the raid.  See Mlodzinski, 648 F.3d at 27, 37–39.

beyond the time it took to secure the premises and arrest and remove the only suspect." Id. at 38. The second woman, the suspect's mother, was held at gunpoint for thirty minutes while forced to sit nearly nude in her bed. Id. at 38-39. Though we recognized that the officers "did initially have to make split second decisions to assess [the mother's] threat level and the possible need for restraint, that does not characterize the entire period in the bedroom" because "it quickly became clear" that she was not a suspect, was compliant with orders, and did not pose a danger to the officers. Id. at 39.

This case bears a remarkable resemblance to Mlodzinski. Both cases involve officers pointing firearms at the heads of innocent, compliant individuals during the course of SWAT team raids at residences thought to be occupied by other individuals who were dangerous. And neither the sister nor the mother in Mlodzinski, nor Stamps, was thought to be dangerous. Mlodzinski affirms that as of at least August 2, 2006, the date of the raid at issue in that case, the state of the law was clear enough to put police officers on notice that a warrant to conduct a SWAT raid does not grant them license to aim their weapons at the heads of submissive and nonthreatening bystanders.[16] As we recognized,

---

[16]     Duncan alludes to our observation in Mlodzinski that the outcome of the case may have varied if, for example, the officer had pointed the gun at the mother's head "for only a very short period." Mlodzinski, 648 F.3d at 40. In Mlodzinski, though, it

this is especially true where, as here, a jury could find that the officer is not forced to act based on a split-second judgment about the appropriate level of force to employ. See id.; cf. Graham v. Connor, 490 U.S. 386, 396-97 (1989). Reviewing the facts in the light most favorable to the plaintiffs, a jury could find that Duncan had adequate time to determine that there was no reasonable threat posed by Stamps and to calibrate his use of force accordingly. See Henry, 652 F.3d at 533 ("It bears emphasis that this also was not a situation in which circumstances deprived [the officer] of the opportunity to fully consider which weapon he had drawn before firing. . . . There was no evidence indicating that [the officer] did not have the split-second he would have needed to at least glance at the weapon he was holding to verify that it was indeed his Taser and not his Glock.").

In light of Mlodzinski, as well as long-standing precedent from other circuits, a reasonable officer in early 2011 would have understood that Duncan's conduct, as a jury could find it, violated clearly established Fourth Amendment law. See, e.g., Espinosa v. City & Cty. of S.F., 598 F.3d 528, 537-38 (9th Cir. 2010) (denying summary judgment on qualified immunity to officers who pointed loaded guns at a suspect "given the low level of threat"); Baird v. Renbarger, 576 F.3d 340, 345 (7th Cir. 2009)

---

was not assumed that the officers had turned off their guns' safeties or that they had kept their fingers on the triggers.

(denying summary judgment on qualified immunity and noting that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment"); Tekle v. United States, 511 F.3d 839, 845–48 (9th Cir. 2007) (denying summary judgment on qualified immunity and noting that "[w]e have held since 1984 that pointing a gun at a suspect's head can constitute excessive force in this circuit," id. at 847); Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1192–93, 1196–97 (10th Cir. 2001) (denying summary judgment on qualified immunity and holding, "[w]e can find no substantial grounds for a reasonable officer to conclude that there was legitimate justification for continuing to hold the young people outside the residence directly at gunpoint after they had completely submitted to the SWAT deputies' initial show of force," id. at 1197); Jacobs v. City of Chi., 215 F.3d 758, 773–74 (7th Cir. 2000) (reversing district court's grant of motion to dismiss on qualified immunity to officers who "pointed a loaded weapon at [the plaintiff] for an extended period of time when they allegedly had no reason to suspect that he was a dangerous criminal, or indeed that he had committed any crime at all, [the plaintiff] was unarmed, and when [the plaintiff] had done nothing either to attempt to evade the officers or to interfere with the execution of their duties"); McDonald v. Haskins, 966 F.2d 292, 292–95 (7th Cir. 1992) (affirming district court's denial of motion to dismiss on qualified immunity where an

officer held a gun to the head of a nine-year-old boy who "posed no threat to the safety of [the officer] or any other police officer present, was not actively resisting arrest or attempting to evade arrest by fleeing, . . . was not engaged in any assaultive behavior toward [the officer] or the other officers" and "was neither under arrest nor suspected of committing a crime, was not armed, and was not interfering or attempting to interfere with [the officers] in the execution of their duties," id. at 292–93); cf. Robinson v. Solano Cty., 278 F.3d 1007, 1014 (9th Cir. 2002) (en banc) (noting that "under more extreme circumstances the pointing of a gun has been held to violate even the more rigorous standard . . . [that] conduct [be] so excessive that it 'shock[s] the conscience.'" (citing McKenzie v. Lamb, 738 F.2d 1005, 1010 (9th Cir. 1984); Black v. Stephens, 662 F.2d 181, 188–89 (3d Cir. 1981))).

We acknowledge that each of these cases presented unique sets of facts that in some respects differ from the facts presented in the case at hand. Nonetheless, their factual differences do not obscure or detract from the straightforward rule that, collectively, they all espouse. When considered alongside Mlodzinski, these cases plainly put police officers in these circumstances on notice that pointing a firearm at a person in a manner that creates a risk of harm incommensurate with any police necessity can amount to a Fourth Amendment violation. On the facts

as a jury might find them to be in this case (safety off, finger on the trigger, and gun pointed at the head of a prone person known not to pose any particular risk), it was clear under existing law that Duncan used his gun in a manner that unlawfully created such a risk.

In light of what we have just said, we conclude that Duncan, "in the 'situation [he] confronted,'" Mullenix, 136 S. Ct. at 309 (quoting Brosseau, 543 U.S. at 200), was on notice that his actions could be found violative of Stamps's Fourth Amendment right to be free from excessive force. Existing precedent places this conclusion "beyond debate," id. at 308 (quoting al-Kidd, 563 U.S. at 741).

We find further confirmation for our conclusion in the expert testimony presented by the plaintiffs. In Mullenix, the Court parried the dissent's critique of the reasonableness of the officer's decision-making by stating that "others with more experience analyze the issues differently," and pointing to a brief filed by the National Association of Police Organizations discussing the options and risks informing the reasonableness of the officer's decision-making. Mullenix, 136 S. Ct. at 311. Here, in contrast, we have a procedural posture and a record supporting the conclusion that police officers are customarily taught not to do what Duncan did. See Jennings v. Jones, 499 F.3d 2, 19-20 (1st Cir. 2007). This evidence reinforces the conclusion that the

unreasonableness of Duncan's conduct, as a jury could find it, was well established.  Not only had the unreasonableness of Duncan's alleged conduct been clearly established as a legal matter, but it had also been well established in a manner that is actually useful to police officers, eliminating the risk that judicial declarations of reasonable firearm use in such situations may miss the mark.  In this sense, our decision does not rely on hindsight to second guess the handling of a difficult situation.  Rather, it simply confirms that in this instance, the reasonableness demanded by the Fourth Amendment is no more than the reasonableness that law enforcement officers regularly demand of themselves.

We end as we did in Mlodzinski, noting that "[o]ur denial of immunity on plaintiffs' version of the events leaves these claims for trial, where [Duncan] may try to persuade the jury that [he] did not do what [he is] accused of doing."  Mlodzinski, 648 F.3d at 40.

## VI.

For the reasons stated above, we affirm the denial of the defendants' motion for entry of summary judgment on the basis of qualified immunity.  Costs are awarded to the plaintiffs.